TERRITORY *v.* JASON LEE.

No. 1651.

EXCEPTIONS FROM CIRCUIT COURT FIRST CIRCUIT.
HON. F. ANDRADE, JUDGE.

SUBMITTED MARCH 5, 1926.                    DECIDED MARCH 26, 1926.

PERRY, C. J., LINDSAY, J., AND CIRCUIT JUDGE PARSONS
IN PLACE OF BANKS, J., DISQUALIFIED.

CRIMINAL LAW—*larceny—consent of owner of property.*

One who presents for payment at a bank a check for a smaller sum and, through mistake on the part of the paying teller, is handed a larger sum than that called for by the check, the receiver knowing that he is not entitled to the overpayment and that such overpayment has been made to him by mistake, does not come into possession of said overpayment with the consent of the owner thereof and is guilty of larceny if he conceals the

amount of such overpayment and appropriates the same to his own use with intent to defraud the owner thereof.

JURIES—*examination of jurors on voir dire.*

The purpose of examining jurors on their *voir dire* is to ascertain whether, for any reason, they are unable to decide the case about to be tried fairly and impartially on the law and evidence, and, in permitting the prosecuting attorney to state to prospective jurors the facts that the prosecution expects to prove in the case, the trial court does not commit error, the examination of jurors on their *voir dire* being largely in the discretion of the trial court.

OPINION OF THE COURT BY LINDSAY, J.

The defendant was convicted of the crime of larceny and brings the case here on exceptions.

The indictment was in two counts, the first count charging that defendant did, on August 23, 1924, unlawfully and feloniously take and carry away certain things of marketable, salable, assignable and available value, to wit, certain moneys in the sum of $1000, belonging to the Liberty Bank of Honolulu, Limited, with intent to deprive the owner thereof of said money. The second count charged defendant with embezzlement of said sum of $1000. At the trial the prosecution elected to proceed against defendant solely on the charge of larceny, and, as already stated, defendant was found guilty of that offense.

The first exception is that the court erred in permitting the prosecuting attorney "to make an extended statement of facts to the jury on the voir dire examination."

From the transcript it appears that, after the names of twelve men had been drawn and sworn on their *voir dire,* the prosecuting attorney addressed them as follows: "The defendant in this case is charged in the indictment with the offenses of larceny and embezzlement, the facts being that on the 23d day of August, 1924,—and I am going to give a more detailed statement than I ordinarily do on account of the peculiar circumstances of the case,—on

the date charged in the indictment the defendant took a check in the sum of twelve hundred dollars to the Liberty Bank of Honolulu, and at about 9 o'clock in the morning or a little before he took this check up to one of the tellers to get it cashed and the teller glanced at the check and mistook the twelve hundred dollars for twenty-two hundred dollars, and paid the defendant twenty-two hundred dollars in currency. He counted out two hundred dollars in ten dollar bills right in front of the defendant, and he then took a bundle of fifty dollar bills containing one thousand dollars——" At this point counsel was interrrupted by the attorney for defendant who objected to the prosecuting attorney's making such a statement, on the ground that it was prejudicial to defendant and not in accordance with the statements usually made under such circumstances. On the overruling of the objection the prosecuting attorney proceeded as follows: "He threw that bundle of a thousand dollars out and took another of the same kind and counted it out, making a total payment of twenty-two hundred dollars."

The purpose of interrogating jurors on their *voir dire* is to ascertain whether for any reason the jurors are unable to decide the case about to be tried fairly and impartially on the law and evidence. This question is largely in the sound discretion of the trial judge. (*Territory* v. *Johnson,* 16 Haw. 743.) There is clearly nothing in this statement of the prosecuting attorney in this case which would tend to disqualify the jurors, if they should be accepted, from doing their duty; it purported to be nothing more than a statement of what the prosecution expected to prove. Such a statement is usual and proper after the jury has been selected and there was no abuse of discretion on the part of the trial judge in permitting it to be given to prospective jurors.

The next exception we will consider is exception 10, under which it is urged that the court erred in compelling defendant to answer the question whether or not he had been gambling on the 23d day of August, 1924, and whether he had not on that day lost between $2200 and $2300. It is contended by defendant that the only purpose this question could serve was to prejudice the jury against defendant; that the question was asked for no other purpose and had nothing to do with the issues involved.

From the transcript, it appears that when the defendant was asked the question now complained of, it was objected to by his attorney solely "on the ground that they cannot go into specific acts. It would make no difference whether he had lost fifty or five thousand dollars. You couldn't do it to prove his character or attack his credibility." After argument was had as to its admissibility, the court allowed the question, whereupon the attorney for defendant, after noting an exception, asked the court to instruct defendant that he might refuse to answer the question on the ground that it might tend to incriminate him. This was done by the court, and the defendant, having refused to answer the question, was next asked, without objection by his attorney, whether in the afternoon of the same day he had gone to the same place and lost two hundred dollars shooting craps, which question the defendant having answered in the negative, the matter was dropped and the defense rested its case.

From the foregoing it is not exactly accurate to say that the court compelled defendant to answer the question, for it affirmatively appears that such was not the case. It is apparent, however, that, had defendant's attorney not requested that defendant be instructed that he need not answer, he would have been required so to do—hence we may consider whether the question was objec-

tionable on the grounds urged. One of the issues, indeed one of the most important matters in issue in the case, was whether the cashier of the bank had that morning paid defendant $1000 more than was called for by the check presented by defendant. On the one hand, the positive testimony of the bank cashier was that he had paid defendant the sum of $2200—$1000 more than the check called for. On the other hand defendant, on direct examination, unequivocally denied that he had been paid $2200 and asserted that he had been paid only the sum of $1200. This being the case the prosecution was entitled to fully cross-examine defendant as to the amount actually paid to him. It is clear that under such cross-examination the prosecution might well have asked defendant, for example, whether, after his visit to the bank, he had not in his possession a sum considerably larger than $1200; whether he had not, soon after leaving the bank, exhibited a larger sum; whether he had not on that day paid several bills aggregating more than $1200; whether he had purchased a high-priced automobile that day, or any such question, and it is equally clear that under the circumstances defendant could be asked whether he had not lost a considerable sum of money that day in gambling. The fact that an answer to that question in the affirmative might tend to incriminate defendant did not render the question improper on cross-examination. The exception is overruled.

Under exception 13 it is contended that the verdict was contrary to the law, to the evidence and the weight of the evidence. In support of this exception, defendant in his briefs argues that "there was not a scintilla of evidence showing or tending to show that the defendant knew at the time that he cashed the check that he had been overpaid one thousand dollars ($1,000.00). If the evidence showed anything at all, it showed that he did not know

at the time he cashed the check that he was overpaid and left the bank without such knowledge, because Mr. Harry S. Loo who cashed the check for the bank testified that defendant did not count the cash. * * * Therefore, the defendant could not have been guilty of the crime of larceny in the first degree or larceny in any degree and could only have been guilty of the crime of embezzlement, if guilty at all."

The testimony of Harry S. Loo, paying teller of the bank, who was the principal witness for the prosecution, was substantially to the following effect: That on the morning of August 23, 1924, shortly before the opening of the bank at 9 A. M. defendant, who had about $1400 on deposit, presented to the witness a check for payment, the check being signed by defendant payable to "cash," for the sum of $1200; that by mistake the witness "took the check for $2200" and paid defendant that amount; that the payment was made in two bundles of fifty-dollar bills (each bundle containing $1000) and $200 in ten-dollar bills, each of the bundles of fifty-dollar bills being labeled "1000;" that when defendant presented the check the witness glanced at it, "took it for $2200," stuck it on a spindle, pulled out from a drawer $200 in ten-dollar bills and laid that on the counter, then took out a bundle of fifty-dollar bills containing $1000 and laid that on the counter, then took out a second bundle of fifty-dollar bills containing $1000 and laid that on the counter. At this moment the witness was interrupted by one of the bank cashiers, who asked the witness some questions about other bank matters, this interruption causing the witness to turn and face the cashier, and when witness turned toward the place at the counter where defendant had stood defendant had left and there was no money on the counter. Witness did not see defendant actually count the money. Immediately after the departure of defendant

witness discovered that he had paid out too much money. Witness informed the cashier of that fact and then went out to look for defendant. He first visited defendant's house but not finding him at home put in most of the rest of the day looking for him. Shortly before six o'clock that afternoon witness, and a man named Kemp, who was helping him in his search, met defendant getting out of his car in front of the Graystone. Witness could not park his car at that place but Kemp jumped out and ran upstairs after defendant and witness heard Kemp yell out to defendant but defendant did not stop. Defendant staid upstairs in the building for some time and when he came down the witness accosted him and said: "I overpaid you a thousand dollars. Will you return that thousand dollars?" Defendant did not directly reply to this but said he would come to the bank and "fix it up." Defendant came to the bank that evening at about 6:30 at which time the witness said to him: "Have you a thousand dollars for me?" Defendant replied: "I don't get a thousand dollars from you. What do you mean?" Witness said: "You know you said you were coming down to fix it up. How much did I give you?" Defendant answered: "Just how much my check called for." Witness said: "Your check is twelve hundred dollars and I paid you two thousand two hundred dollars." Defendant answered: "You never paid me no twenty-two hundred dollars."

The vice president and manager of the bank testified that there was a shortage of $1000 in the cash of the paying teller on August 23, 1924. The assistant cashier testified that on the morning of August 23 he saw defendant at the bank shortly before 9 o'clock and that he saw the paying teller count out and hand to defendant two bundles of fifty-dollar bills and hand them to defendant with some other money. The next time the

witness saw defendant was that evening about 6:30, at which time defendant insisted that he had been paid just what his check called for and denied that he had received $2200.

Defendant took the stand on his own behalf and testified that when he presented the check he received only $1200, the payment being made in twenty ten-dollar bills and twenty fifty-dollar bills, the latter being in one bundle; that when he reached his house sometime during the day he found that the witness Loo had left a note with his wife asking defendant to come to the bank at 6:30 that evening; that he met the witness Loo that afternoon near the Graystone and that on Loo's asking him if he had received his note, defendant said he had and that he would be at the bank at 6:30; that Loo said something about $1000 and that defendant said he would be down at the bank that evening, but did not say that he would "fix it up" or anything to that effect. At the bank that evening on being asked if he had not been overpaid to the extent of $1000, defendant said he had not, but had only received $1200—the amount his check called for; whereupon the assistant cashier got angry and threatened to have him put in jail. Defendant replied that if there was to be any trouble "you know where I live, my address is 1513 Miller street," and defendant then left the bank premises.

From the foregoing resume of the evidence it can scarcely be said that there was not a scintilla of evidence showing or tending to show that the defendant knew at the time that he cashed the check that he had been overpaid $1000. On the contrary there is sufficient evidence from which the jury could infer that defendant was overpaid and that he was aware of that fact. The exception is overruled.

Under exception 16 it is contended that the court erred

in giving the prosecution's instructions Nos. 7 and 7A, and in refusing to give defendant's requested instructions Nos. 8 and 10. These instructions read as follows:

Instruction No. 7. "I further instruct you that if you believe from the evidence beyond a reasonable doubt that the defendant took the money mentioned in the indictment into his possession while the same was lying on the counter in the bank, and that at the time he so took the money he knew it was not his own, and that he intended then and there to steal the same and convert it to his own use and to deprive the owner, to wit, the Liberty Bank of Honolulu, a corporation, of its property, then you shall find him guilty as charged."

Instruction No. 7A. "I further instruct you, that if you believe from the evidence beyond a reasonable doubt that the defendant, through inadvertence and mistake on the part of the agent of the Liberty Bank of Honolulu, a corporation, was paid one thousand dollars more than the check in evidence in this case calls for, such sum of money in excess of that which he was entitled to receive, was taken by the defendant without the consent of the owner thereof, to wit, the said bank, even though the said bank through its said agent voluntarily parted with its physical possession."

Defendant's requested instruction No. 8. "Gentlemen of the jury, you are instructed that the crime of larceny consists of two elements, the taking or theft of the property with the fraudulent intent to deprive the owner thereof, and in order to constitute the crime of larceny you are instructed that the prosecution must prove to you, beyond all reasonable doubt, that if any property was taken by the defendant, as alleged in the indictment, it was taken by the defendant with the intent to steal the same, and that said fraudulent intent existed at the time of the taking of the money; and if the prosecution does not so prove such facts to you, beyond all reasonable doubt, then it is your duty to acquit the defendant."

Defendant's requested instruction No. 10. "You are

instructed, gentlemen of the jury, to find the defendant not guilty."

In support of this contention defendant in his brief, referring to instruction No. 8, says that "had this instruction been given, the defendant would have been acquitted because there was absolutely no evidence before the jury, direct or circumstantial, showing or tending to show that the defendant knew at the time he cashed the check that he was overpaid."

The court, at the request of defendant, instructed the jury that: "There can be no larceny if the property alleged to be stolen was taken with the consent of the owner or his authorized agents, and if you so find from the evidence then you must acquit the defendant." The court also gave the following instruction on behalf of defendant: "Gentlemen of the jury, you are instructed that in order to constitute the crime of larceny the fraudulent or felonious intent must exist at the time of the taking. If the defendant came lawfully into the possession of the goods and such intent was subsequently formed, it cannot relate back and make the acquirement of the property fraudulent, and you must find the defendant not guilty."

This latter instruction covered the point contended for by defendant in his requested instruction No. 8 and, perhaps, was even more favorable to the defendant than was warranted.

The contention of the defense throughout the trial as well as before us seems to be that where a party comes into possession of money of another with the consent of the other and later converts the money to his own use, he may be guilty of embezzlement but he is not guilty of larceny. This contention may be sound, but, in the present case the defense goes farther and contends that the evidence in this case shows that, if the defendant came

into the possession of the amount in excess of $1200 at all, he did so with the consent of the owner or his agent, hence defendant cannot be convicted of the crime of larceny, unless, at the very moment he received the money he knew that he was being overpaid and conceived the intent to steal the same. The vice of this contention is that it assumes that where one party hands to another a sum of money, the first party erroneously thinking he is giving a small amount when in fact he is giving a larger, the second party comes into possession of the larger sum with the consent of the giver. In such a case it cannot be seriously said that the giver *consented* to the receiver's taking the money not intended to be given. In such a case there is lacking that meeting of minds without which there can be no consent. As expressed by Wharton on Criminal Law, Vol. 2, Sec. 1215: "The transfer to pass such title as bars larceny must be the consent of two minds to one thing." The precise question under discussion is admirably set forth in the case of *Wolfstein* v. *People,* 6 Hun 121. In that case the defendant was the possessor of a draft drawn payable to his order by one L. Boell on a bank for the sum of $74 in gold. It was accepted by the parties upon whom it was drawn and made payable on demand at the German American Bank. On the day of its acceptance it was presented by the defendant at the bank for payment and the paying teller, who was unable to read the French language in which it was written and who read the figures upon the draft $742, paid to the defendant that sum of money in gold. The party to whom the money was paid, knowing that he was entitled to receive only $74, took the larger sum ($742) thus paid to him by mistake, and, without disclosing the error, concealed and denied the overpayment, and feloniously appropriated it to his own use. The court in upholding a conviction of

larceny in this case said (p. 122) : "The case then presents this question : If a party who receives from another money to which he knows he is not entitled, and which he knows has been paid to him by mistake, should conceal such over-payment and appropriate the money to his own use, intending thus to cheat and defraud the owner thereof, would he or not be guilty of the crime of larceny? If it be answered that he would not, can the element needed to make it such, and which is absent, be pointed out. The money, in excess of that which he is entitled to receive, is taken without the owner's consent, and that which is thus taken is appropriated to the taker's use with intent, fraudulently, to deprive the owner thereof. These two elements make the crime of theft, and they are both present here. It will not do to say that the owner parts with the property voluntarily, and therefore there is no unlawful taking. There may be the physical act of the owner handing that which is his to another, but there is absent the intellectual and intelligent assent to the transfer, upon which the consent must necessarily depend. Where money or property is obtained from the owner by another upon some false pretense, for a temporary use only, with the intent to feloniously appropriate it permanently, the taking, though with the owner's consent, is larceny. Wherein do the cases differ? In both there is a physical delivery by the owner, and in both the taker knows that it was given for no such purpose as he has in mind, and yet he, unlawfully and wickedly, in both cases, seeks to deprive the owner thereof. If the one case is larceny, the other is also. So, too, the finder of property, if he knows the owner and conceals such finding, and appropriates it to his own use, with intent to deprive the owner thereof, is guilty of larceny. So in this case, if the prisoner found, on counting the money, that in his possession to which he knew

he was not entitled, and which he also knew the owner did not intend to deliver to him, he was bound to return it to the owner, and if he did not, but concealed its possession and sought to deprive the owner thereof, the crime was complete. From the evidence in this case, and the verdict rendered, we are bound to assume that the mistake was noticed and discovered by the prisoner at some time. If the over-payment was observed in the bank when the money was delivered, and the prisoner took it with the intent to cheat and defraud the owner, the crime was then complete. If, however, the error was not then noticed, but was afterward, and the intent of felonious appropriation was then formed and executed, the legal guilt of the prisoner was at that time incurred. As in the case of the finder of the lost article, the original taking may be lawful, but legal accountability as for crime begins when the owner is discovered and the intent formed unlawfully and feloniously to deprive him of the possession thereof."

We are in thorough accord with the law as enunciated in the above case, and hold that the trial court in giving prosecution's instructions Nos. 7 and 7A, and refusing to give defendant's requested instructions Nos. 8 and 10 committed no error.

We have examined all of the other exceptions argued and find them without merit. The exceptions are overruled.

*H. Hathaway,* City and County Attorney, for the Territory.

*W. B. Pittman* for defendant.