D. C. Stansbery, *Appellant*, v. Medo-Land Dairy, Inc., *Respondent.*[1]

[1]Reported in 105 P. (2d) 86.

329

*Bailey, Heussy & Clarke* and *Hyland, Elvidge & Alvord,* for appellant.

*Meier & Meagher,* for respondent.

JEFFERS, J.—Plaintiff, D. C. Stansbery, as assignee of all money due or to become due from defendant, Medo-Land Dairy, Inc., under and by virtue of a contract entered into on August 9, 1937, whereby it was agreed that Hollywood Dairy Farm, Inc., Grace Gevurtz, and Eldon Pickard would sell to defendant all the milk produced from Hollywood Farms and a farm known as the Willows, brought this action against defendant to recover the sum of $4,056.14, which it is alleged the defendant wrongfully deducted and paid out of the funds due for milk delivered under the contract, and to which plaintiff was entitled under his assignment.

Defendant denies that any sum is due and owing plaintiff from defendant under the above assignment.

The trial court made findings of fact, conclusions of law, and judgment in favor of defendant, and dismissed plaintiff's complaint. Plaintiff filed motions for

new trial and for judgment notwithstanding the oral decision of the court, which motions were denied. From the judgment entered, plaintiff has appealed.

The facts are somewhat complicated, and the testimony relative to some of the situations is not as clear as might be desired, due probably to the fact that Phil Gevurtz, to whom further reference will be made, and who acted for Hollywood Dairy Farm, Inc., Grace Gevurtz, and Willows Dairy, Inc., was not called as a witness.

Prior to November 27, 1935, Grace Gevurtz and Phil Gevurtz and Willows Dairy, Inc., were operating two dairy farms in King county. One was known as Hollywood Farms, and the other as the Willows, the latter being situated on a farm rented from King county at a monthly rental of $125. These farms were operated together, by the Gevurtzes, with one dairy herd. At this time, Mr. and Mrs. Gevurtz, Hollywood Farms, and the Willows, to whom we shall hereinafter refer generally as assignors, were heavily indebted to various persons and corporations, one of the largest creditors being United Securities Company, of which plaintiff was an officer. The assignors at this time were selling to Western Dairy Products Company, of Seattle, all milk produced.

On November 27, 1935, Grace Gevurtz, doing business under the trade name of Hollywood Farms, and Phil Gevurtz, as first parties, Willows Dairy, Inc., as second party, and D. C. Stansbery, as third party, entered into a trust agreement, wherein plaintiff was designated as trustee, and by an assignment made the same day, all sums due or to become due to the two dairies from delivery of milk were assigned to plaintiff. The agreement provides in part:

"The parties of the first and second part desire to have the trustee take entire charge of the financial

management of said farms and have possession of the gross proceeds from the sale of milk by said farms and by the parties of the first and second part."

In paragraph 4, it is agreed

". . . that all sums received by the trustee shall be expended by him in the payment of the expenses incurred by the parties of the first and the second part in the operation of said farms and in the payment of the indebtedness of the parties of the first and second part. Parties of the first and second part agree that they will incur no indebtedness in the operation of said farms subsequent to the date of this agreement, without the consent of the trustee."

It may be noted that this agreement in no way obligated plaintiff to pay any expenses incurred in the operation of these farms, or on indebtedness of first and second parties, other than from the money received by plaintiff under this agreement and assignment.

On August 9, 1937, Hollywood Dairy Farm, Inc., as first party, Grace Gevurtz and Eldon Pickard, as second parties, and Medo-Land Dairy, Inc., as third party, entered into a written contract, whereby it was agreed that first and second parties would sell to defendant the entire output of milk from Hollywood Farms and the Willows, for a period of five years.

On the date last mentioned, another contract was entered into between Hollywood Dairy Farm, Inc., as first party, Phil Gevurtz, as second party, and G. Ribary, as third party, wherein reference was made to the other contract that day executed, and whereby it was agreed that, in consideration of 115 shares of stock in the Medo-Land Dairy, Inc., first party would sell and convey to third party all the milk routes owned and developed by first party. By this same contract, Phil Gevurtz agreed to buy 134 shares of stock in defendant company for $2,700, to be paid for at the rate

of one hundred dollars per month, such sums to be deducted by third party from the amounts due to first party on account of milk delivered to it. Phil Gevurtz was also to be made sales manager of defendant company, at a salary to be later determined, which salary was to be credited on the price of the stock purchased by him. G. Ribary was the president of, and owned a controlling number of shares of stock in, Medo-Land Dairy, Inc.

By the first contract of August 9, 1937, above referred to, defendant was to take over a contract of Hollywood Farms to supply milk to Firlands hospital, and defendant was to have all the proceeds from the sale of milk to the hospital.

On or about September 20, 1937, Hollywood Dairy Farm, Inc., and the Willows Dairy, Inc., executed an assignment to plaintiff, but notice of such assignment was not given to respondent until October 7, 1937. This assignment is in the form of a letter written by the assignors above mentioned, to defendant, and states in part:

"The undersigned does hereby sell, assign and transfer to D. C. Stansbery of Seattle, Washington all sums of money due or to become due by reason of the delivery by the undersigned of milk from Hollywood Farms and from the King county farm known as the 'Willows' and any and all sums of money due and to become due by reason of the sale to you of any of the business or affairs of the milk business of the undersigned.

"This assignment is subject to an assignment given by the undersigned to the Federal Land Bank of Spokane.

"This assignment is given pursuant to an agreement dated November 27, 1935, between the undersigned and D. C. Stansbery and is irrevocable by the undersigned until such time as you may be released from this assignment by the said D. C. Stansbery."

On October 7, 1937, defendant, by letter, acknowledged receipt of this assignment, the material provisions of the letter being as follows:

"It is agreeable to us to accept this assignment, subject to prior assignments that have been filed with us and garnishments previously served upon us, and an attachment made by the Treasury Department of the United States government.

"For your information, as far as we know, these prior assignments are to The Federal Land Bank of Spokane, $475.00 per month, to King County, Washington, $125.00 per month, to the Caledonian Hotel, $1,000.00, and to Lockwood Lumber Company, $352.72.

. . .

"The acceptance of this assignment is further subject to a deduction of $100.00 per month, provided for in a certain contract made August 9, 1937, between Hollywood Dairy Farm, Inc., Phil Gevurtz and G. Ribary, which was consented to by Grace Gevurtz and Eldon Pickard.

"You have advised us orally that some of these assignments would be withdrawn, which, of course, would remove them from the condition of acceptance. It is also understood that our liability to you shall never be greater or more burdensome than it would be to the assignors had this assignment not been executed."

The foregoing statement gives a general background for the various issues raised herein. A more detailed statement will be made where necessary in connection with the various items in dispute.

The assignors delivered to defendant their entire output of milk from August 9, 1937, to May 11, 1938, and it is admitted that the sum of $15,598.63, found by the trial court to be the agreed or reasonable value of all milk and cream so delivered, is the correct amount. During the period last mentioned, defendant made certain deductions from the sums due assignors under their contract, the amount of such deductions being

subtracted from the amount due, and checks were sent to plaintiff each month for this difference, with a statement of the deductions.

It is the right of defendant to make these deductions which forms the principal issue in this case.

The trial court made some twenty-eight findings, to the effect that defendant's deductions were properly made, and that defendant was entitled to a credit of $16,086.38, for the deductions and payments made to plaintiff; that defendant was liable for the sum of $15,598.63, for milk and cream received, thus showing an overpayment of $487.75; that, while defendant was not entitled to this overpayment from plaintiff, it was entitled to warrants still held by King county, in the sum of $350.83. As above stated, plaintiff has appealed from the judgment entered on the findings.

Appellant bases error upon the making of some twenty-three findings of fact; upon the conclusions of law made and entered by the court; and upon the refusal of the court to make findings of fact and conclusions of law as proposed by appellant. Error is also based upon the refusal of the court to grant appellant's motion for new trial, and also in refusing to enter judgment in favor of appellant.

The trial court, in finding No. 29, made a recapitulation of all milk and cream furnished by assignors to respondent under the contract, and found the agreed value thereof to be $15,598.63. Appellant makes no objection to this item.

The trial court also considered all the deductions questioned by appellant and hereinafter referred to, and other deductions not questioned by appellant, and all payments made by respondent to appellant, and found that such deductions were properly made by respondent, and that the total of such deductions and payments was the sum of $16,086.38.

Appellant has segregated into twelve groups the items which he claims were wrongfully deducted by respondent, as follows:

A. Caledonian hotel deduction........................ $694.01
B. Dairy products supplied to Hollywood cookhouse..... 352.81
C. Material, supplies and equipment claimed to have been purchased for and delivered to Hollywood dairy... 1,007.89
D. Dairy products delivered to third persons and charged to Hollywood dairies............................ 274.52
E. Miscellaneous items, such as hiring truck, long distance telephone calls by Gevurts................ 92.98
F. Payments claimed to have been made to third persons 514.84
G. Butterfat purchased elsewhere by respondent—difference between contract price and market price.. 72.24
H. Skim milk for pigs............................... 88.00
I. A. Sender ...................................... 150.00
J. Shortage on accounting for delivery and sale to county agencies ...................................... 258.85
K. King county rental deductions..................... 62.50
L. Federal Land Bank deductions, covering first half of September .................................... 237.50

With the exception of some few items, we believe the items in the groups above set out may be divided into three classes, and we will so divide and discuss them.

We shall first discuss those deductions which were made by respondent pursuant to authorization from the assignors, either orally or in writing, prior to October 7, 1937, the date on which notice of appellant's assignment was given to respondent. Under this class would fall appellant's groups A, D, K, and L.

While the testimony relative to the Caledonian hotel item of $694.01 (group A) is not as clear as it might be, there is testimony that there was an assignment of this amount by assignors prior to appellant's assignment, and that the above amount was paid by respondent.

Group D covers deductions made for milk furnished to A. S. Van Horn, John Erickson, and George Zamber-

lain. These men had painted some signs for assignors, and had not been paid. Prior to appellant's assignment, it was agreed between respondent and assignors that respondent should furnish milk to these parties in payment of their services and should deduct the value of such milk from the amount due assignors under the contract. This agreement was carried out, respondent furnishing the milk and making the deductions.

The objection of appellant as to group K goes only to the deduction of $250 for rent of the Willows for April and May, 1938, and for the first half of September, 1937. Appellant contends respondent is not entitled to make these deductions, as respondent did not account to appellant for the milk for the first half of September, 1937, and respondent received checks for milk from King county for April and May, 1938. Prior to appellant's assignment, the assignors assigned to King county, out of the milk money due from respondent, the sum of $125 per month as rent for the Willows. Under this assignment, which was accepted by respondent, it was required to pay, and did pay, rent from September, 1937, to May, 1938, both months inclusive. While it is true respondent did not account to appellant for money due under the milk contract for the first half of September, yet King county, to whom respondent was furnishing milk for its various institutions, deducted $125 each month from the amount due respondent and remitted only whatever balance was due. Clearly, respondent was entitled to make this deduction for each month that King county had deducted the amount of $125 for rent of the Willows, from the amount due respondent for milk furnished the county.

Under group L, appellant objects to the deduction of $237.50, paid by respondent to the Federal Land

Bank for the first half of September, 1937. As shown by the testimony, the Federal Land Bank payment was not made until September 29, 1937, and was made from money owing for the last half of September. This was prior to appellant's assignment, and assignors had been paid the amount due them for the first half of September. These facts appearing, it was proper for respondent to deduct the full sum of $475 due the land bank from the amounts due assignors for the last half of September.

There is one other item under appellants group F which falls under this general classification, namely, an item in October, 1937, referred to as "Solicitors," twenty-five dollars, and a like item in November, 1937. This deduction was for the salary of one Jack Hess, under and by virtue of an agreement between assignors and respondent, made before the assignment to appellant, whereby Hess was employed to act as a solicitor to build up the milk routes. This item of fifty dollars for salary to Hess was properly allowed as a deduction.

 Notice to the debtor of an assignment is not necessary to render the assignment binding as between the assignor and assignee. However, the debtor is not bound thereby until he receives notice of the assignment, and prior to receiving such notice the debtor may settle his obligation with his creditor, or may apply the money owing to his creditor upon other assignments made by his creditor, or upon instructions from his creditor, without rendering himself liable to the assignee. The assignor can assign no greater interest than he has, and the assignee gets no greater right than the assignor had, at the time notice of the assignment was received by the debtor. 4 Am. Jur. 301-7, §§ 89-98; 2 Williston on Contracts (Rev. ed.), 1251, § 433; *Dial v. Inland Logging Co.*, 52 Wash. 81, 100 Pac. 157; *Young v. American Can Co.*, 131 Wash. 374, 230 Pac. 147. See,

also, *Association Collectors, Inc. v. Hardman*, 2 Wn. (2d) 414, 98 P. (2d) 318.

The trial court found the deductions set out and referred to in appellant's groups A, D, K, and L were proper deductions to be made from the sums due assignors under the milk contract, and we are of the opinion these deductions were justified on the theory that they were authorized by the assignors prior to the time respondent received notice of the assignment to appellant.

We next come to appellant's groups B, C, E, F, G and H, which we will classify as expenditures reasonably and necessarily made by respondent to keep the dairy farm in operation and to enable assignors to fulfill their contract with respondent. Appellant contends these expenditures and deductions were made without his consent or approval, and were therefore not justified. This contention is based upon the provisions of the original trust agreement of 1935, particularly that part which provides that appellant is to "take entire charge of the financial management of said farms and have possession of the gross proceeds from the sale of milk by said farms," and the assignment which provides that appellant is to receive "all sums of money due or to become due" from the sale of milk.

While it is true the language of the trust agreement is that appellant shall be entitled to the gross proceeds from the sale of milk, it is plain from the testimony herein, including that of appellant, that neither assignors nor appellant treated the trust agreement as requiring assignors to account to appellant for the actual and necessary expense of operating the dairies, but treated the contract as requiring assignors to account for the net proceeds after the actual expense of operation had been paid. That this was the construc-

tion placed upon this contract, both before and after the assignment, we think is evident from the following testimony of appellant, when interrogated relative to this agreement:

"Q. You do not mean to say that the Gevurtzes could not go ahead and operate the farm, could they, as provided in that trust agreement? A. They could operate the farm, and they did operate the farm, yes. Q. And they would necessarily have to incur expense? A. Usual and ordinary, that is right. Q. Yes, usual and ordinary expense. A. Yes."

We refer to further questions propounded to and answered by appellant:

"Q. Did you ever tell Mr. Gevurtz not to get any more supplies for Mr. Ribary or the Medo-Land Dairy? A. No, I don't think I did. Q. Did you ever instruct the truck driver not to get gas and charge it to the Medo-Land Dairy? A. I am trying to recall if I ever saw the truck driver. I believe I did and I believe— I don't remember that I spoke to him about the gas. Q. Did you ever instruct Mr. Ribary not to pick up groceries and charge them to the Medo-Land Dairy and deliver them to the farm? A. I believe not. Q. And yet you knew all the time that these deductions were being made, did you not? A. I did."

The testimony of Mr. Ribary and the employees on the dairy farm, who were familiar with its operation, was all to the effect that all of the items included in this group, to which appellant is objecting, were necessary for the continued operation of the dairy, and hence necessary to enable assignors to produce and deliver milk under the contract with respondent.

It should be kept in mind that appellant was not obligated, either under the trust agreement or his assignment, to pay one cent on the operation of the dairy or the obligations of assignors, except from money received by him from the proceeds of milk sold to respondent. The necessary expense of operation of these

farms had to be paid, and so it does not seem to us that appellant's rights could be prejudiced by the fact that respondent paid some of these expenses, if such expenses so paid were reasonably necessary to the operation of the dairy, and were not arbitrarily made by respondent.

"It has been held that an assignment of money to become due under an executory contract does not prevent the anticipatory debtor from doing whatever appears to be reasonably necessary to enable the assignor to perform the contract, and that the assignment is subject to the right of the original parties to rescind or modify the contract, where such right is exercised in good faith, and not with intention to defraud the assignee." 6 C. J. S. 1152, § 96.

A case in point on this question is *Peden Iron & Steel Co. v. McKnight,* 60 Tex. Civ. App. 45, 128 S. W. 156, from which we quote:

"It is true that some authorities express the rule to the effect, that after notice of the assignment the debtor deals with the assignor at his peril, and can do nothing that will adversely affect the interest of the assignee. If intended to apply to all cases and to admit of no exceptions, that statement of the rule is too broad. It should be qualified by the statement that, when the existence of the assigned fund is dependent upon performance by the assignor of an executory contract, the anticipatory debtor may, at any time, do whatever reasonably appears to be necessary to enable the assignor to perform the contract."

See, also, *Morris v. Nelson,* 124 Kan. 127, 257 Pac. 729.

Many of the items under appellant's group B, which were supplies furnished the cookhouse on the dairy, may be justified on the theory that it was agreed between assignors and respondent, prior to appellant's assignment, that, in view of the fact that all milk and cream was being sold to respondent, dairy products

such as milk, cream, and butter, necessary for use on the farm, would be purchased from respondent, and the amount thereof deducted from the milk checks. We are also of the opinion the items last above mentioned and the other items set out in group B, such as eggs, bread, meat, and other supplies of that nature, were reasonably necessary for the operation of the farm. It appears that there were strikes at the dairy, due in part at least to the fact that the help was furnished insufficient and poor food, and that many of these items were furnished in order to keep the men on the job and to prevent a failure of the milk delivery. It further appears that Gevurtz had no money or credit to buy supplies, and that these supplies had to be furnished by either respondent or appellant. We are of the opinion, as was the trial court, that these items were reasonably necessary, and were therefore proper deductions to be made by respondent.

What has been said about group B applies also to group C, which consists of such items as bottle caps, gasoline for trucks, milk cans, repair of water cooler, and hauling of milk. Under this last group is listed repairs for truck and truck parts. The truck used by assignors to deliver the milk to respondent was an old Dodge truck, which was continually breaking down and had to be repaired, and on some occasions respondent had to send out another truck to get the milk. Under the agreement, the milk was to be delivered to respondent by assignors. It further appears that, on a good many occasions, this truck did not have enough gasoline to return to the farm, and respondent furnished this gasoline. These items were charged to assignors and deducted from the amount due under the contract, and we think properly so.

Group E includes truck hire, which has already been referred to in group C, and also insurance on the Dodge

truck, and long distance telephone calls made by Mr. Gevurtz in connection with the dairy business. We are of the opinion these deductions were properly allowed.

Group F covers the payment of wages to Fowler, Roloff, and five other employees. While the testimony is not as clear as it might be as to the nature of the employment of these men, we are not prepared to say that the testimony does not support the finding of the trial court that the payment made to them was reasonably necessary, and the deduction therefore proper. As to three of these men, Bender, Johnson, and Dwyer, it appears that, on March 1, 1938, appellant notified them he was without funds to pay their wages, and it further appears that appellant told Gevurtz to get money wherever he could, or to get it from respondent.

In December, 1937, and January, 1940, assignors permitted the production of milk to fall nearly fifty per cent below the amount covered by their contract with respondent. Because of this situation, respondent was compelled to go out and buy milk to supply its trade, and pay therefor the sum of two cents per pound of butterfat more than the contract price which it paid to assignors. Respondent deducted this difference from the money due under the contract, and we are of the opinion the deductions referred to in group G were properly allowed.

Group H refers to skim milk furnished by respondent to assignors to feed some pigs on the farm. Appellant makes some contention that it was not shown that these pigs belonged to assignors, or that the milk was in fact fed to them. It appears that the pigs were without food, and Gevurtz was without money to buy feed. It further appears that an employee of the farm had wages owing him, and caused some of the pigs to be levied on and sold to satisfy his claim. It also appears

that some of the proceeds from the sale of the pigs was used to buy feed for the milk cows. We are of the opinion the evidence does not preponderate against the finding of the trial court that the deduction made for this milk was proper.

The testimony as to the items under the above general classification, and the necessity therefor, is uncontradicted. In fact, there is no testimony that any item paid for and deducted by respondent was other than essential to the operation of the dairy.

The item of $150 paid to A. Sender will be discussed separately, and may not be classed in either the first or second general classification. On January 25, 1938, assignors sold to A. Sender all their rights under the milk contract with respondent. The contract with Sender was not to take effect until March 1, 1938. Sender purchased some of assignors' cows and four bulls. However, it appears that assignors could deliver only two bulls, and in lieu of the other two bulls which were to have been delivered and included in the contract price, it was agreed that a quantity of grain of the value of $250, or cash in that amount, would be paid Sender. This part of the Sender contract was guaranteed by appellant. Sender testified that, when he took possession of the farm, there was no grain there, but it was agreed between Gevurtz, appellant, and himself that some baled straw on the place would be substituted for the grain, to the extent of one hundred dollars, and that Sender would receive $150 from respondent from money due under the milk contract. This sum of $150 was paid by respondent to Sender and deducted from the milk money. We are of the opinion this deduction was proper.

Group J, which refers to shortage on accounting for delivery and sale to county agencies, needs no discussion, for the reason that the trial court, in arriving at

its conclusion as to the amount of milk delivered to the different county institutions, and the amount of the payment received therefor, accepted the figures contended for by appellant under this item.

There is one other item in dispute which must be referred to, namely, the warrants issued by King county in payment of milk delivered by respondent to the various King county institutions. It is admitted this money is owing to someone, and it has been paid into court. A reference to the recapitulation by the trial court in finding No. 29, shows that deductions and payments to appellant were allowed in the amount of $16,086.38, while respondent received milk and cream of the value of $15,598.63 only, showing an overpayment to appellant of $487.75. In other words, the amount due under the milk contract was $487.75 less than the total expense paid out by respondent and the amount paid to appellant under his assignment.

We have heretofore indicated we are in accord with the findings of the trial court as to these expenditures and deductions made by respondent. The trial court held that, while respondent was not entitled to judgment against appellant for the overpayment, it having been made voluntarily, respondent was entitled to the warrants issued by King county, and we are of the same view.

Appellant finally contends that respondent, by its conduct, is estopped from claiming many of the items allowed by the trial court. This contention is based upon the claim that respondent had knowledge of the various agreements with the assignors, under which respondent was to make certain payments and deduct the amounts thereof from the money to be earned under the milk contract, and concealed these facts from appellant.

We are of the opinion this contention is without

merit. There is nothing in the record which even tends to show that respondent, at the time appellant's assignment was accepted, in any way intentionally failed to reveal any of the agreements or prior assignments. There is no testimony which tends to show that any of the parties acted other than in good faith. The trial court found that there was no evidence of a conspiracy between respondent and the assignors to defraud appellant.

The testimony shows that, at the time respondent accepted the assignment, appellant did not make any attempt to ascertain the condition of the account between the assignors and respondent. Furthermore, the terms of the acceptance, to which appellant agreed, show clearly that all items which had been agreed to be paid by respondent and deducted were not included therein, nor did respondent represent that the specific prior assignments mentioned were the only ones.

In addition to the factual situation, we are of the opinion that appellant cannot invoke the doctrine of estoppel against respondent, for the reason that appellant is not a purchaser for value of the assigned claim. 6 C. J. S. 1166, § 117. In *Young v. American Can Co.,* 131 Wash. 374, 230 Pac. 147, we stated:

"But appellant now asserts that the respondent is estopped to deny its liability upon the credit memorandums. Unfortunately for this contention, appellant did not plead estoppel, or raise that issue in the court below, and moreover the evidence shows that William Young parted with nothing on the faith of the credit memorandums. On the contrary, it appears by appellant's own testimony that they were assigned to him to secure a preexisting debt. Hence there was no estoppel."

Appellant, in the instant case, took the assignment as security for a preexisting debt, and in doing so, in no way obligated himself personally. He advanced vari-

346

ous sums of money to assignors, but it is apparent from his own testimony that this was done voluntarily. Appellant cannot invoke the doctrine of estoppel in this case.

For the reasons assigned, the judgment is affirmed.

BLAKE, C. J., BEALS, STEINERT, and DRIVER, JJ., concur.

[No. 27978. Department Two. September 6, 1940.]

