**RHODE ISLAND DISCOUNT CO. et al. v. UNITED STATES.**
No. Deptl. 177.

United States Court of Claims.
Jan. 9, 1951.

Henry C. Hart, Providence, R. I., Cummings, Stanley, Truitt & Cross, J. Edward Burroughs, Jr., Washington, D. C., on the brief, for Rhode Island Discount Co.

O. Walker Taylor, Boston, Mass., Francis T. Leahy, Boston, Mass., on the brief, for Frank Mulready, Receiver for Somerset Shipyards, Inc.

Milton Kramer, Washington, D. C., Schoene, Freehill, Kramer & Davis, Washington, D. C., on the brief, for A. L. Smith Iron Co. and T. W. Evans Cordage Co.

Albert Brick, Washington D. C., for International Engineering & Supply Co. and Alfred E. Corp, etc.

Carl Eardley, Washington, D. C., H. G. Morison, Asst. Atty. Gen., Russell W. Koskinen and Elizabeth B. Davis, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

This case has been referred to the court by the Comptroller General of the United States pursuant to Sections 1493 and 2510 of the Judicial Code, 28 U.S.C.A. Our problem is to determine which one, or ones, if any, of several claimants are entitled to certain moneys earned by the Somerset Shipyards, Inc., in the performance of a contract with the Government. The several claimants are the Rhode Island Discount Company, which claims under an assignment from Somerset, Somerset itself, whose claim is contested by the Government because Somerset is indebted to the Government, and several creditors who supplied materials to Somerset for which they have not been paid.

On September 4, 1942, the Government acting through the Transportation Corps, entered into Contract No. W–2789 TC–68 with Somerset for the construction of seven steel barges for a lump sum price

which, as reduced by change orders, was $247,737.74. On October 13, 1942, the contract was amended by Supplemental Agreement No. 1, which provided that the Government would advance $79,800, which was 30 percent of the original contract price, to Somerset. Article 3 of Supplement 1 provided that all the advances thus made, and 75 percent of the progress payments made to Somerset during the performance of the contract should be deposited in a special bank account and used for no other purpose than the construction of the barges. The advance itself was to be repaid by deductions of 30 percent from all payments made to Somerset under the contract. The $79,800 was actually advanced to Somerset on November 16, 1942.

On May 12, 1943, Somerset made an assignment of all amounts payable to it under the contract to Rhode Island Discount Company, which had full knowledge of the terms of the contract and of Supplemental Agreement No. 1. On the security of this assignment, Rhode Island loaned Somerset $100,967.52.

By August 30, 1943, Somerset had earned, under the provisions of the contract for progress payments, $212,800 of which the Government had retained 10 percent, as it was entitled to do until the contract was completed and the barges accepted; had paid itself 30 percent, plus interest, in partial reimbursement of its advance of $79,800; had paid Somerset $83,790 before the assignment to Rhode Island on May 12, and Rhode Island $49,288.42 after the assignment. It will be observed that the Government did not place 75 percent of the money earned by Somerset in a special deposit to be used only for expenditures in the performance of the contract, as it had a right to do under Supplemental Contract No. 1. If it had done so, Rhode Island would have received $36,966.32 (75% of $49,288.42) less than it did receive.

In August 1943 Somerset's financial condition was hopeless. It could not meet its payrolls, it could not borrow any money, and a quick audit of its books showed that its cash assets were $5.79 and its current unpaid bills were $141,824.21. It had completed only four of the seven barges called for by the contract, but had received about 85 percent of the contract price. The Government was entitled to terminate the contract and have the work completed by someone else, holding Somerset responsible for the excess costs. But Somerset would have been unable to pay the excess, the barges were essential to the war effort, and any attempt to have another contractor complete the three remaining barges would have resulted in delay, with no compensating advantage. It seemed wise, and necessary, then, to make some new arrangement whereby Somerset could be enabled to complete the barges. The new arrangements were embodied in Supplemental Contract No. 2, made in September 1943. It was made pursuant to the First War Powers Act, 50 U.S.C.App. Sec. 611, and Executive Order No. 9001 which authorized agencies of the Government to amend existing contracts without regard to the normal legal requirements. The terms of Supplemental Contract No. 2 were that Somerset might retain all payments theretofore made in the sum of $121,892; that the Government would pay to Somerset $45,618.10 to pay Somerset's outstanding obligations as of August 24, 1943; that the Government would pay all costs incurred after August 24, 1943, in the completion of the barges; and that upon completion of the barges Somerset would be given an additional credit in an amount sufficient to liquidate the unpaid balance of the advance of $79,800 which the Government had made to Somerset. The Government did not include the balance which Somerset owed Rhode Island in its undertaking to pay Somerset's past debts, because it concluded that the payment of this amount would not facilitate the completion of the barges. The $45,618.10 which it did agree to pay was for past debts for labor and materials.

The sum of $121,892 recited in Supplemental Contract No. 2 as having been paid on the contract to Somerset and Rhode Island was erroneous. As the table in finding 10 shows, a payment of $11,186.42 had been made to Rhode Island on August 30, and had been overlooked. On Septem-

ber 28, 1943, Supplemental Contract No. 3 was made between Somerset and the Government, giving to Somerset the right to retain that additional amount, making a total of $133,078.42 paid by the Government and for which Somerset should no longer be accountable.

Somerset seeks to include some costs for the completion of the three barges, which the Government disputes. Its conceded costs of completing the remaining three barges after August 24, 1943, were $56,824.11. This sum, plus the $45,618.10 which the Government had promised to pay to Somerset for payment of its existing debts for labor and materials, making a total of $102,442.21, is the amount owing to Somerset for the performance of the contract as modified by the Supplemental Contracts. Somerset has been paid $75,000.72 leaving a conceded balance of $27,441.49, with certain other asserted costs in dispute. The Government has counterclaims against Somerset in the amount of $80,020.04 for unpaid taxes incident to this and other contracts, and advances made by the Government to the contractor on other contracts.

■ We consider first whether Somerset is entitled to the additional amounts claimed by it under Supplemental Contract No. 2. The first item is $1,338.50, which represents the difference between the $45,618.10 which the parties supposed was the amount of Somerset's outstanding liabilities for labor and materials on August 24, 1943, and $46,956.66, the actual amount of such liabilities. We have no doubt that if the parties had been aware of the larger amount, they would have stated that amount in their agreement. But, from the nature and circumstances of the agreement, which was in effect an agreement by the Government to pay Somerset's debts, we think the Government would not have been willing to agree to pay all such debts in whatever amount they might be discovered to exist. The agreement was to pay debts in a fixed amount, and we think it cannot be expanded to include after discovered debts.

■

■ Somerset claims as its second item of additional costs of completion after August 24, 1943, depreciation on its plant and facilities. It is, in effect, claiming that Supplemental Contract No. 2 made of its contract a normal cost-plus contract, with reimbursement for all expenses, both out-of-pocket, and indirect. We think the parties did not so intend. The contract started out as a lump sum contract. Then came Somerset's financial difficulties, and the modification of the contract by Supplemental Contract No. 2, making terms more liberal to Somerset in order to get the barges completed. What Somerset needed to complete these barges was cash to pay for labor and materials and machines. The amortization of the costs of its facilities and equipment by giving it money for depreciation would have had nothing to do with the completion of the barges. We see nothing in Supplemental Agreement No. 2, nor in the conduct of the parties under it, which persuades us that Somerset was to be paid depreciation as an element of the costs of completing the barges.

■ The third item claimed by Somerset is a proportionate part of the launching costs of the seven barges, which part, it claims is attributable to the last three barges and is therefore a cost of the completion of the barges incurred after August 24. All launching costs were, in fact, incurred and paid prior to August 24. By Supplemental Contract No. 2 the Government agreed to pay costs incurred before August 24 and not paid, and costs incurred after August 24. We think that agreement did not contemplate that the Government would reimburse Somerset for pre-August 24 costs which it had succeeded in paying, although an accurate system of accounting might have attributed a portion of these costs to the last three barges.

There is, then, a balance of $27,441.49 which Somerset earned and which has not been paid. As we have said, we must determine which, if any, of the several claimants is entitled to all or a part of that amount.

[4, 5] Rhode Island Discount Company on May 12, 1943, took an assignment from Somerset of its right to payments under the original contract, as modified by Supplemental Contract No. 1. The original contract provided, as is shown in finding 3: "(f) Payments to an assignee of any claim arising under this contract shall not be subject to reduction or set off for any indebtedness of the assignor to the United States arising independently of this contract." Rhode Island loaned Somerset $100,967.52, on the security of this assignment. The Government was duly notified of the assignment, and thereafter, by payments made in June, July, and August 1943, paid Rhode Island $49,288.42. If the Government had, as it had the right to do, under Supplemental Contract No. 1, placed 75 percent of its payments in a special account to be used only for the expenses of the contract, Rhode Island would have received currently only one-fourth as much as it did receive. When it was learned, in August 1943, that Somerset was in hopeless financial straits, and could not, without special assistance, complete the contract, the Government could have terminated the contract. If it had done so, Rhode Island, as assignee, would, of course, have received no further payments under its assignment. The Government did not terminate, but, for reasons which seemed prudent to it, made new arrangements with Somerset in Supplemental Contract No. 2, under which the payments to be made were earmarked for specified purposes, leaving no free money to be paid to Somerset or to the plaintiff as Somerset's assignee. Rhode Island concedes that an owner, party to a contract, may, as against an assignee of the other party to the contract, make whatever changes are necessary to obviate impediments and make possible performance of the contract. Homer v. Shaw, 177 Mass. 1, 58 N.E. 160; Peden Iron & Steel Co. v. McKnight, 60 Tex.Civ. App. 45, 128 S.W. 156; Stansbery v. Medo-Land Dairy, 5 Wash.2d 328, 105 P.2d 86; Williston on Contracts, Section 433. Rhode Island claims, however, that the provision in Supplemental Contract No. 2 for paying Somerset's obligations incurred prior to August 24, 1943, did not facilitate performance of the contract; that labor and materials which these debts represented were already incorporated in the barges, and that paying these creditors would have had no bearing on obtaining further materials to complete the contract. The Government says that its purpose in providing for the payment of these past debts was to make sure that these suppliers would be willing to continue to supply materials to Somerset. In fact they did not so continue, except in one instance in a small amount.

We think that Rhode Island is right in its contention that a change in arrangements prejudicial to an assignee of a contract must have a real relation to the object of obtaining completion of performance. But we think that, in the circumstances, the decision of the Government's agents that the payment of $45,618.10 to the unsecured creditors who had furnished labor and materials was reasonable, and was sufficiently related to obtaining completion of the contract to be valid against Rhode Island. The making of Supplemental Contract No. 2 cost Rhode Island nothing. If it had not been made, Rhode Island would, as we have said, have received no further payment under its assignment.

■ Although the Government, in Supplemental Contract No. 2, promised Somerset that it would place $45,618.10 in a special deposit for Somerset's creditors or would pay them directly, it did not, in fact, do so except to the amount of $18,076.63. As appears from our findings 12 and 18, Somerset itself, with funds from some other source, paid all except $17,926.05 of the rest of these debts. After notice to all the remaining creditors to appear and assert their claims in this suit, five creditors filed claims, and four of those five presented evidence in support of their claims. These creditors base their claims upon two grounds. The first is that they are third party beneficiaries of the Government's promise to Somerset, in Supplemental Contract No. 2, either to place money in a special deposit from which

they would be paid, or at the option of the Government to pay them directly. However, the contract here involved was a Massachusetts contract, and the law of Massachusetts, contrary to the weight of American authority, does not recognize any right in a third party beneficiary against the promisor in a contract made for his benefit. Exchange Bank of St. Louis v. Rice, 107 Mass. 37, 41; Rogers v. Union Stone Co., 130 Mass. 581, 593; Saunders v. Saunders, 154 Mass. 337, 28 N.E. 270; Borden v. Boardman, 157 Mass. 410, 32 N.E. 469.

■ The second asserted ground of the creditors' claims is that the Government promised them directly that it would either see them paid or pay them. We think that such promises have not been proved. The Government's agents who made Supplemental Contract No. 2 with Somerset supposed that it would result in the payment of these creditors, and, upon inquiry, informed the creditors of the arrangement that had been made for their benefit. There was no novation, whereby the creditors released Somerset and looked only to the United States for payment. They continued to bill Somerset, and in fact Somerset paid some of them. If direct promises to the creditors had been made by the Government, the promises would have been promises to pay the debts of Somerset, and would have had to satisfy the Statute of Frauds, Massachusetts General Laws, Title V, Ch. 259. No writing evidencing any promise to the creditors was made. One of the creditors, the A. L. Smith Iron Co. received a partial payment of $1,247.50, the amount of one of its bills, by a check which bore the signature of an official of the Government. The question whether such a partial payment would, under Massachusetts law, take the transaction out of the Statute of Frauds, has not been briefed for us and, in view of our conclusion that there was no promise of the Government directly to the creditors, we do not decide it. If promises to the creditors had been made, and if they had satisfied the formal requisites, there would still be the troublesome question of whether there was any considera-

tion for them. The consideration which some of the creditors assert is their refraining from suing Somerset and thus, perhaps, causing the definitive collapse of its shaky financial structure. We do not decide that question.

■ Since the creditors do not get the money which Supplemental Contract No. 2 intended them to get, what becomes of it? Somerset cannot get it, because it is much more than balanced by Somerset's debts to the Government. Is Rhode Island entitled to any part of it? Although an assignee of a nonnegotiable contract would normally take subject to any offsets which the other contracting party might have against the assignor, the original contract here in question provided, as shown above, that an assignee of it should not take subject to offsets arising independently of the contract. The Government could not, then, set off against Rhode Island, at least so far as the original contract price was concerned, any of Somerset's debts to the Government except the $10,503.78 which Somerset owes the Government for taxes arising out of the performance of the contract. See finding 22.

■ Subject to this offset, is Rhode Island entitled, under its assignment, to what Somerset earned which is still in the hands of the Government? We think that the doctrine hereinbefore discussed which permits an owner to change his arrangements with his contractor in order to obtain completion of the contract, in disregard of an assignment of the contractor's rights to payments, should be applied only to the extent necessary to accomplish its purpose. It is really a doctrine of priorities, recognizing a primary right in the owner to obtain the fruits of his contract even though the means which he must use to get them infringes upon what would have been the rights of the assignee, if performance of the contract had gone smoothly. We see no reason, however, why, after the owner has gathered the fruits to which he is entitled, and there is something left, the assignee should not get that. He is a useful party to the transaction, having furnished at least some

of the money which made performance possible. If the changed arrangements diverted directly to suppliers or labor some of the money which would otherwise have gone to the assignee, that is not a reason why other money, not so diverted, should not go to the assignee.

In the instant case the Government, in Supplemental Contract No. 2, agreed with Somerset to divert $45,618.10 to the creditors. If it had done so, the diversion would have been valid as against Rhode Island. But it has not done so, except to the extent of $18,076.63, and has in this litigation put the creditors to the test of their legal rights to the money. We have concluded that they have no legal rights. Only Rhode Island and the Government are left, then, to contend for this money.

As shown in finding 10, the Government has paid the contractor, Somerset, and its assignee, Rhode Island, $287,879.14 on the contract. It has received only the seven barges originally contracted for at a lump sum of $247,737.74. In spite of this overpayment of more than $40,000, it still owes $27,441.49. The reason for this overrun beyond the contract price is, of course, the changes made in the contract by Supplemental Contract No. 2. Do the rights of the assignee, Rhode Island, including its right to have no setoff made against payments to it, apply to the excess payments and the unpaid liability, to which the contractor was not entitled at the time it made its assignment to and borrowed the money from Rhode Island? We think not. To the extent to which the new agreement made by Supplemental Contract No. 2 increased the contract price, the assignee would be receiving a windfall if it could assert its rights as assignee to the additional money which the Government had to pay to the contractor to get what it was already entitled to for a smaller fixed sum. The assignee did not, of course, rely on this additional money in taking its assignment and lending its money, since at that time everyone expected that the contract would be performed for the agreed price. We think, therefore, that since the $27,441.-49 here in question represents a sum in addition to the payments already made which exceeded the original contract price by $40,000, the assignee obtained no right in it superior to the Government's primary right to set off its claims against Somerset. We think it would be highly inequitable to require the Government not only to pay an amount greatly in excess of the price agreed upon in the contract as it was when it was assigned, but in addition to forego, in favor of the assignee, its right to collect by setoff a part of what the assignor owes it on other accounts.

### The Counterclaim Against Somerset Shipyards, Inc.

Somerset Shipyards, Inc., is, as shown by findings 20, 21, and 22, indebted to the Government for unrepaid advances of $3,001.60 and $39,034.71 and for taxes in the amount of $27,479.95, in addition to its indebtedness of $10,503.78 for taxes in connection with performance of the contract here in question. The sum of these several items is $80,020.04. It is entitled to a credit of $27,441.49 for amounts earned by it under Supplemental Contract No. 2, but not paid. Judgment will be entered against it and in favor of the Government for the difference, which is $52,578.55.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER, and LITTLETON, Judges, concur.