### ST. MARY'S BANK v. CIANCHETTE.
No. 332.

United States District Court
D. Maine, N. D.
Sept. 10, 1951.

Arthur A. Hebert, Augusta, Maine, for plaintiff.

Frank M. Coffin, Lewiston, Maine, Michael Pilot, Bangor, Maine, for defendant.

CLIFFORD, District Judge.

This action was commenced in the Somerset County Superior Court and was removed to this court on a timely petition brought by the defendant and acquiesced in by the plaintiff. Jurisdiction of this court is based upon diversity of citizenship, the plaintiff being a corporation duly organized under the laws of the State of New Hampshire and the defendant being a resident and citizen of the State of Maine, and the amount in controversy, exclusive of interest and costs, exceeding the sum of $3,000.

This is an action against a prime contractor by an assignee of monies to become due under the construction contract of a subcontractor. The plaintiff is a bank which extended credit to the subcontractor, on the security of an assignment to it by the subcontractor, one Joseph Croteau, doing business as the New Hampshire Building and Construction Company, of its contract with defendant to construct temporary housing facilities at a United States Government air base, at Houlton, Maine.

The plaintiff contends that, although it advanced the sum of $56,000 to Croteau, the subcontractor, and although the defendant accepted the assignment, the defendant has failed to pay to the plaintiff a balance of $8,137.08 due under the assignment.

The defendant contends that, by the terms of the contract between the subcontractor and himself, the subcontractor agreed to finance the cost of labor and materials as the job progressed, and that subsequently the subcontractor defaulted on this obligation and called upon the defendant to pay the bills, and thus brought about an alteration in the contract. The defendant asserts that the plaintiff took an assignment of the contract subject to future changes and that, in fact, the contract was so altered and changed that in the latter stages of the job, no monies became due to the subcontractor and therefore, payable to the plaintiff, as assignee.

After the case had been submitted to the court upon an agreed statement of facts, an important side issue developed when the plaintiff asserted that the subcontractor used the funds advanced to him by the plaintiff on a second and different project, where he was also a subcontractor of the defendant. This second project was the erection of facilities at the Dow Field Sub Depot, at Bangor, Maine. The contention of the plaintiff was that the $56,000 was partly spent by Croteau, the subcontractor, in financing payrolls and purchases of materials at Dow Field, Bangor. The plaintiff asserts that such financing was contrary to the arrangements made with the plaintiff bank, in that the advancements received by the subcontractor were to be used by him only on the Houlton job. It was asserted that this diversion of funds took place at the suggestion of, or with the knowledge of, the defendant, resulting in unjust enrichment to the defendant. The plaintiff contended that the defendant had the benefit of these funds on the Bangor job, and was not called on by the subcontractor to use his own credit or funds, whereas, if the subcontractor had properly

used his advances from the bank on the Houlton job, the defendant would have had to pay the plaintiff bank for monies due the subcontractor, and, at the same time, would have had to pay all the bills on the Bangor job.

The defendant, as will be pointed out, vigorously objected to the introduction of the above issue into the case, and, after this court had overruled his objection, argued on the merits that there could have been no enrichment on his part for the reason that, to the extent that the subcontractor may have been able to finance the Bangor job with the use of monies supposed to go into the Houlton job, he was reimbursed by the defendant through progress payments paid to the subcontractor as the work progressed.

Finally, the defendant asserts that he not only paid the plaintiff bank all monies that became due to the assignor, that is, the subcontractor, on the Houlton job, but he overpaid the bank in the amount of $2,690.40 for which he filed a counterclaim, asking for affirmative relief.

As above indicated, the case began in Somerset County in the Superior Court, and testimony was taken out at a hearing. The case was later discontinued and a second action was commenced in the state court. When this second action was removed to this court, a pre-trial conference was had and the parties agreed to submit the record of the prior testimony and the exhibits referred to therein for whatever admissible evidence they might contain. At the same conference the parties agreed on a statement of facts, as indicated by pre-trial memorandum dated September 28, 1949. The parties thereafter submitted briefs and reply briefs on the issue of defendant's alleged breach of his obligations under the assignment.

This court, in reviewing the briefs, was confronted, for the first time, with the allegation by the plaintiff concerning unjust enrichment of the defendant caused by the diversion of funds by the subcontractor to the Bangor job with the knowledge of the defendant. This court felt that this charge was so serious that, not-withstanding the prior submission of the case by the parties on the state court record and an agreed statement, the possibility of an injustice being done was strong enough to warrant a reopening of the case to receive evidence on this issue. It was the opinion of this court that it had the power, at any time, prior to judgment, in the exercise of its judicial discretion, to reopen the case for this or any other purpose consonant with justice and a correct decision. Accordingly, by order dated June 6, 1950, the cause was reopened for further evidence.

■ To this action of the court, the defendant objected, filing a brief and making oral argument in support of his objection and motion to rescind. Defendant argued that the parties and the court were bound by the agreement to submit the case on the pre-existing record and stipulation of facts. He also urged that, under the burden of proof doctrine, the fact that the court at the time felt that not enough evidence had been submitted to warrant a decision, demanded judgment for the defendant. Finally, he contended that the matter of unjust enrichment had not been placed in issue by the pleadings. The court suspended final ruling on this motion until after submission of all further evidence. The view taken by the court on the merits makes a rule on this point of procedure unnecessary. It may be said, however, that this court is of the opinion that a trial judge possesses sufficient control over a cause in hearing before him to receive additional evidence in his discretion if by so doing justice is done. See G. Amsinck & Co. v. Springfield Grocer Co., 8 Cir., 1925, 7 F.2d 855; Sprague v. Woll, 7 Cir., 122 F.2d 128, 130; Tuttle v. Howland, 143 Me. 394, 75 A.2d 374.

Hearing pursuant to the order was had on June 7, 1950. On November 8, 1950, both parties were given the opportunity to explore completely the financial relationship incidental to the Bangor job, so-called.

Finally, supplemental briefs and reply briefs were filed as a result of the new evidence.

Most, if not all, of the important facts relating to liability of the defendant under the assignment have been agreed upon by counsel. They are as follows and are here specifically adopted as findings of fact:

1. On December 16, 1942, a contract was entered into by the War Department of the United States of America and the defendant, whereby the defendant agreed to construct housing facilities at the Houlton Airfield, Houlton, Maine, the original contract price to be $60,574, the contract being identified as number W–175–eng–2272. Later change orders on this contract authorized additional work for which a further price of $6,338 was to be paid. The final total contract price was $66,912.

2. A basic agreement was drawn up as of December 16, 1942, between defendant and Croteau the vital portion of which is as follows: "Wilfred Croteau as president of the New Hampshire Building and Construction Co. further agrees that all work on said contract shall be done by the New Hampshire Building and Construction Co., and they are to pay for all bills for the full completion and acceptance of the said project such as labor, materials, equipment, bond, insurance, or any bill connected therewith."

3. In a letter dated December 16, 1942, Croteau submitted a bid to the defendant for the construction of buildings and other work to be performed at the Houlton Airfield in the amount of $60,574. The bid was accepted by the defendant, through his office manager, on December 21, 1942. Extra work was later added to this contract, bringing the full amount of the contract price to $66,912.

4. On January 8, 1943, Croteau assigned to the plaintiff bank, "all of assignor's right, title, and interest in and to all moneys due or to become due to assignor from J. R. Cianchette, Pittsfield, Maine under the following contract(s) or purchase orders (hereinafter referred to as 'contract(s)', as same may be hereinafter amended, modified, or extended by the parties hereto."

5. By letter dated January 8, 1943, the plaintiff enclosed a copy of the assignment in duplicate to the defendant, requesting a letter of acknowledgement. Under letter dated January 13, 1943, defendant, through his office manager wrote the bank as follows: "We are hereby acknowledging receipt of this assignment on monies due said Croteau on the contract for construction work at Houlton Maine Airbase."

6. Payments to the bank under the assignment were made by defendant as follows:

| | |
|---|---|
| February 9, 1943 | $4,178.13 |
| March 20, 1943 | 27,000.47 |
| June 18, 1943 | 5,338.41 |
| Total $36,517.01 | |

7. Croteau knew that under his contract with defendant he was to furnish all material and labor. However, during the latter part of December, in 1942, he approached the defendant stating he could not locate either a bulldozer or a steamshovel. Defendant thereupon called on other contractors in the area to ascertain if such equipment could be made available. The equipment was finally obtained after the defendant advanced the money to Croteau and deducted such advances from Croteau's credit. At the time this question was brought up, the defendant had made a firm commitment to the United States Government in his contract with the Government, in which contract there was a penalty for delay and prosecution of the work. Payment for the rental of two steamshovels, one bulldozer, and trucks, used on the Houlton job, was made by defendant on March 4, 1943, and was deducted from Croteau's credit, being agreed to and acquiesced in by Croteau. On a later occasion, when Croteau, the subcontractor, was unable to procure trucks, defendant obtained a trucker to do the necessary work and paid him directly. On April 14, 1943, Croteau told the defendant that he did not have enough money to carry on the job. At that time, the defendant, out of necessity, agreed to finance the job by advancing checks to Croteau to cover and pay bills for materials and payrolls. Further, the defendant paid for Croteau's insurance and bonds, also, his water and tax bills, and expenses incurred as a result of trips

and telephone calls on behalf of Croteau. Croteau does not question the correctness and necessity of the bills paid by the defendant.

8. The total amount of money paid to the bank is $36,517.01. The total amount of advances to Croteau is $22,316.18. The amount of bills paid directly by the defendant to the creditors (including a small bill of $31.80, due as transportation tax) is $3,169.29. The amount of money owed by Croteau to defendant for work done and equipment supplied is $7,573.62. The total of all of these bills is $69,576.10. The total income under the contract, as has been stated, was $66,912. Overpayments by the defendant were, therefore, in the amount of $2,664.10.

9. Between January 14, 1943, and April 6, 1943, the bank advanced to Croteau the sum of $56,000.

10. On July 28, 1943, the bank inquired by letter of defendant asking to know the exact amount of money then due Croteau on the job and how much work remained to be done. About five months later, on December 27, 1943, the defendant, through his officer manager, answered the bank and enclosed letters and statement revealing all the work in which Croteau was involved with the defendant, such information relating to the Houlton and Bangor jobs. The delay in furnishing the bank with the requested information was due, in large measure, to the difficulties encountered by the defendant and office manager in their attempt to learn what bills, contracted for by Croteau, were still outstanding. On December 23, 1943, the defendant wrote Croteau enclosing a final accounting of contracts both at Houlton and Bangor.

11. The Houlton job was completed in August, 1943, after a few hundred dollars worth of final work had to be performed by the defendant.

12. On September 11, 1943, the bank seized funds in Croteau's account in the amount of $6,409.60. It also sold two trucks and a skill saw belonging to Croteau obtaining therefor the sum of $1,032.50. The money in Croteau's account seized by the plaintiff had been advanced to Croteau by the defendant to be used by Croteau in the payment of bills.

The problem confronting this court is the proper application of the law to the above facts. The real question of fact is whether or not the contract between Croteau and the defendant was ever "amended, modified or extended" by them. If it were, then the plaintiff bank by the terms of the assignment, became subject to such alteration. If this contract were "amended, modified, or extended" in good faith by Croteau and the defendant, then Croteau had no legal right to receive further monies from the defendant, and, by the same token, the plaintiff bank had no legal right to receive monies from the defendant.

Williston, in his 1936 Treatise on Contracts, section 433, page 1252, states: "* * * if payments under an executory contract are assigned, the debtor may set up failure of the assignor to fullfill his part of the contract though such failure occurs after notice of the assignment, for the assignee cannot give a larger right than he has himself."

See also 5 C.J. Assignments, section 146, page 959, and 6 C.J.S., Assignments, § 96, pages 1152–1153, where the following statement appears: "It has been held that an assignment of money to become due under an executory contract does not prevent the anticipatory debtor from doing whatever appears to be reasonably necessary to enable the assignor to perform the contract, and that the assignment is subject to the right of the original parties to rescind or modify the contract, where such right is exercised in good faith, and not with intention to defraud the assignee."

[2] The assignee is in no better position than the assignor insofar as legitimate defenses of the debtor are concerned, in short, the assignee stands in the shoes of the assignor under such circumstances.

In American Bridge Company v. City of Boston, 202 Mass. 374, 88 N.E. 1089, a defendant, situated, as was the defendant in the case at bar, was allowed to recoup damages sustained as the result of the non-fulfillment of a contract by the as-

signor in the face of a claim by the assignee under a "monies due" assignment for the original contract price. The court analyzed the rights of the parties as follows, 202 Mass. 376, 88 N.E. 1090: "At the time of the notice what were the rights between him and the defendant, so far as respects this contract? He was entitled to receive these sums, but he was also under an obligation to complete his contract. This right of the defendant to claim damages for the nonperformance of the contract existed at the making of the contract and at the time of assignment and of notice, and the assignees knew it, and they also knew that it would become available to the defendant the moment the assignor should commit a breach. Under these circumstances it must be held that the assignees took subject to that right."

Peden Iron & Steel Co. v. McKnight, 60 Tex.Civ.App. 45, 128 S.W. 156, 159, cited by plaintiff, affirms the rule that: " * * * when the existence of the assigned fund is dependent upon performance by the assignor of an executory contract, the anticipatory debtor may, at any time, do whatever reasonably appears to be necessary to enable the assignor to perform the contract."

And in Stansbery v. Medo-Land Dairy, Inc., 1940, 5 Wash.2d 328, 105 P.2d 86, 91, the facts are similar to those at bar, although they did not involve a construction contract. In that case a dairy farmer supplied a purchaser with milk under contract. The farmer later assigned his contract to the plaintiff. The purchaser accepted the assignment. Subsequently, the dairy farmer ran into difficulties and the debtor paid for supplies, equipment, repairs and other expenses incurred by the farmer in operating his farm. The milk purchaser, in making payments for the milk to the assignee, deducted these expenses from the gross purchase price of the milk before paying the assignee. The court held this to be justified, stating: "The necessary expense of operation of these farms had to be paid, and so it does not seem to us that appellant's (assignee's) rights could be prejudiced by the fact that respondent paid some of these expenses, if such expenses so paid were reasonably necessary to the operation of the dairy, and were not arbitrarily made by respondent."

To the same effect is Globe Indemnity Co. v. West Texas Lumber Co., Tex.Civ. App., 34 S.W.2d 896.

A similar case, involving a subcontractor who became unable to finance his work and thereafter worked for the contractor on salary, is Homer v. Shaw, 212 Mass. 113, 98 N.E. 697. The Massachusetts Court, in holding that the total contract price never became due to the assignor and, therefore not payable to the assignee stated, 212 Mass. 117, 98 N.E. 698: "The parties, while they could not modify to his (assignee's) prejudice the terms of the contract assigned without the plaintiff's consent, or by a secret fraudulent arrangement deprive him of the benefit of the assignment, were not precluded from entering into a new agreement if performance by the assignor had become impossible from unforeseen circumstances."

The plaintiff seeks to distinguish the above case on the ground that an abandonment took place. But as the above authorities indicate expressly and by implication, the rule allowing the debtor to deduct expenses reasonably borne by him, and constituting a change in the undertaking of the original parties, before paying the assignee applies also in cases of inability by the assignor to continue to finance his operation under the contract. In the case at bar the document of assignment contained the specific provision making it subject to amendments and modifications by the original parties to the contract—that is, Croteau and the defendant.

In the original contract signed by Croteau and the defendant, Croteau agreed to pay "for all bills for the full completion and acceptance of the said project". The facts as set forth in paragraph 7, above, agreed to by counsel for the parties, makes the conclusion inescapable that Croteau's inability to finance the job resulted in a major change in the contract. The defendant under the pressure of completing the job was forced to advance money for labor, materials, and equipment. He was entitled to deduct the total amount of

money so advanced by him from the credits accumulated by Croteau. Such a deduction clearly revealed that at the end of the Houlton job there were no monies due Croteau which had not been paid to the plaintiff bank. In fact, the defendant had paid more money to the bank than was actually due Croteau.

This court therefore draws this conclusion of law: That the defendant under the particular circumstances of this case, is under no further liability to the plaintiff by reason of his acceptance of the assignment.

This court will now consider the liability of the defendant under the Unjust Enrichment Theory.

The following facts appear from the evidence:

1. About the middle of February, 1943, Croteau commenced work for the defendant on constructing facilities at a subdepot, at Dow Field, Bangor, under contract W-175-eng-2360. This contract, if completed called for payments of $115,000. Although there were several jobs being carried on by Croteau at Bangor at this time, the above-mentioned contract, numbered 2360, was, by far, the most important.

2. Croteau applied to plaintiff bank for a loan on contract 2360 but was refused the loan after the Reconstruction Finance Corporation failed to approve the application for the loan.

3. Croteau, without notifying either the plaintiff bank or the defendant, used funds, advanced to him by the plaintiff bank on the security of the Houlton contract, for payrolls and other expenses incurred at Bangor during the latter part of February and early March, 1943. These monies were used by Croteau on the several jobs in process at Bangor, but his accounting and his system of bookkeeping, made it impossible to trace these funds to any one of these specific jobs in Bangor, but he did use the greatest amount on contract 2360.

4. At the time the plaintiff bank learned of this diversion of proceeds of the Houlton loan, the entire amount of $56,000 had been drawn and expended by Croteau.

5. Croteau, in the course of work on the Bangor job, received progress payments from the defendant, which defendant passed on to Croteau, in proportion as the work neared completion. As U. S. Army Engineers certified the job to have reached a certain percentage of completion, the War Department would forward a check to the defendant representing the same percentage of the contract price, with ten percent of the same withheld until final acceptance by the United States. Defendant, as the checks were received, passed on to Croteau the proceeds insofar as the bills paid by Croteau justified such payment.

The first two progress payments received by Croteau from the defendant were $16,955.95 paid on May 5, 1943, and $7,991.98 paid on May 18, 1943.

6. Both checks representing progress payments were deposited in Croteau's account in the plaintiff bank.

The defendant has vigorously argued that the plaintiff, even were there evidence of unjust enrichment on the part of the defendant, would have been barred from pressing such claim because of the bank's negligence in failing to be aware of Croteau's use of the funds on the job in Bangor and by reason of its laches in failing to seize large balances frequently on hand in Croteau's checking account in plaintiff bank. It does not appear that the officials of the plaintiff bank were guilty of any failure to use due care. As for the claim of laches, the defendant has not introduced any proof that it was prejudiced by any delay on the part of the bank in seeking a remedy. Had the bank seized Croteau's checking account balance, at any time, it is reasonable to conclude that such action would have thrown upon defendant an additional burden of paying the obligations of the Bangor job.

Such issues, however, are not important in view of the facts set forth in paragraph 5 regarding payments made by defendant to Croteau after the diversion of funds by Croteau to the Bangor job. These payments, by defendant totalling $24,997.93, fully answer the claim of the

plaintiff that defendant was unjustly enriched by the diversion of some of the proceeds of the Houlton loan to the Bangor job. The balance sought by plaintiff is in the principal amount of $8,137.08. Had Croteau not used any of the Houlton funds on the Bangor job he would not have been able to finance that job to the extent that he would have been entitled to progress payments. Defendant in such case would have had to pay the bills from the beginning and would merely have kept all progress payments received from the United States as his just due.

Therefore, this court concludes, as a matter of law, that the defendant was not unjustly enriched because of any wrongful use of funds by Croteau.

Defendant contends that since his total expenses for the Houlton job exceed his income therefrom by $2,690.40, he is entitled to receive such sum from plaintiff as an overpayment caused by a mistake of fact. Defendant contends that payments to the plaintiff would have been less had he realized the extent to which he would have to take care of unpaid obligations of Croteau.

However, it is apparent that the defendant could have learned of the status of Croteau's accounts before making payments to the plaintiff bank, had he been reasonably diligent. The means were at hand if he had seen fit to use them. Although Croteau's records and accounts were ill kept and in a confused condition, nevertheless, the defendant held the purse strings, had the responsibility of seeing that the work was done, and chose Croteau as the subcontractor with whom to do business. It is to be noted also that the plaintiff wrote the defendant on July 28, 1943, asking the status of Croteau's accounts and the defendant did not reply until December 27, 1943. It is fair to assume that during the pressure of construction during the war years, the defendant's system of accounting was partly at fault for the overpayment made by him.

Under these circumstances, where both the plaintiff and the defendant have suffered loss through an unreliable and financially irresponsible third party, it is not fair or equitable to compel a repayment by plaintiff of the amount sought by the counterclaim of the defendant.

In 40 American Jurisprudence, "Payment", section 201, the writer states the following principle which applies to this cases: "The rule that money paid under a mistake of fact may be recovered back does not apply where the payment has caused such a change in the position of the other party that it would be unjust to require him to refund * * * and as a general rule in cases where the plaintiff and the defendant are equally to blame for the mistake under which the money was paid, or equally innocent in respect thereto, an alteration of position on the part of the payee is held to prevent liability in an action for recovery."

This court therefore concludes that the defendant is not entitled to recover on its counterclaim.

It is therefore ordered, adjudged, and decreed that judgment in the original action be entered for the defendant, without costs.

It is further ordered that judgment on the counterclaim be entered for plaintiff, without costs.