## JOHN R. SAPP v. STATE OF FLORIDA

26 So. (2nd) 646        June Term, 1946
June 14, 1946                    En Banc

*Coe & Eggart,* for appellant.

*J. Tom Watson,* Attorney General, and *Reeves Bowen,* Assistant Attorney General, for appellee.

THOMAS, J.:

Whether "a non trespassory breach of duty to return another's property mistakenly received [can] constitute a larceny" is thought by counsel for appellant to be the substantial question presented in this appeal. The answer must depend on the precise attitude and intention of appellant at the time he received from a bank more than four thousand dollars—on a check he presented—instead of the amount of thirty-six dollars for which the check was drawn.

In order to comprehend clearly just what occurred and the true import of his actions, it is necessary for us to describe the check and recount in considerable detail appellant's behavior at the time of the transaction and immediately following it.

The check was drawn by New Amsterdam Casualty Company and was payable to the order of John R. Sapp, appellant, in this form:

"PAY TO THE ORDER OF John R. Sapp
Thirty-six and no/100 ——————————— DOLLARS
In Payment of Compensation Benefits as Set Forth Below—

| Policy Number | From | To | Total Paid to Date | No. of Wks. | Partial-Final |
|---|---|---|---|---|---|
| SC-644266 | 9-14-45 | 8-27-45 | $4328.37 | 240 | Partial" |

We now give a digest of the testimony which the jury evidently believed and considered sufficient basis for their verdict of guilty. Appellant first exhibited the instrument to the

cashier of the bank who placed under the endorsement appellant's address, "Rt.—2—Box 38," and the inscription "OK 2." The cashier then directed him to the proper window where the check could be cashed. Appellant, in his turn, handed the check to the teller and immediately drew her attention to an error made by the cashier in noting the address, whereupon the teller added to the box number the figure "2" so it would read "382." The teller noted that the check had been "OKed" by the cashier. She misread the amount payable as $4328.37 instead of $36 and, not having this much money at her counter, went to the head teller where she obtained two one-thousand-dollar bills, ten one-hundred-dollar bills, and twenty fifty-dollar bills, which she supplemented with $328.37 from her own till. As appellant stood at the window the teller counted the money to herself, then aloud as she delivered it to him. He asked her to let him see the check again, and after he had examined it she inquired if there was any mistake, to which he replied, "No, I don't think so," then he departed with more than $4000 which was not his. The essential details of the occurrence at the teller's window was corroborated by two customers of the bank who stood in file behind the appellant.

When the bank closed for the day, the teller discovered a shortage in her accounts approximating the amount of the overpayment; so she, accompanied by a deputy sheriff, her father, and others, sought out appellant. He told them he had delivered the money to his attorney; then his son, in the presence of the father, promised that he and his father would see the attorney and report at the bank in thirty minutes; also, according to one witness, they promised that all the money would be delivered to the bank the following morning. Though the appellant appeared at the bank that evening, the money was not then returned, nor has it ever been.

An employee of the attorney testified that she delivered the check to appellant in an envelope on which she had inscribed the amount, $36, and both she and her employer swore that appellant did not return and leave any money whatever. It is significant that this witness, the attorney's employee, stated that the appellant had personally received many of the

checks before, checks which we understand were a series of payments of compensation benefits.

The night of the incident, apparently sometime after the teller and the others had called on appellant, the appellant told some officers he had lost the money, and this is the thread of his defense, but we dismiss it with the simple observation that if property is actually stolen, subsequent loss of it does not excuse the larcener. So we avert to the fundamental proposition—that is, whether the evidence of the state was sufficient to establish larceny beyond a reasonable doubt.

The situation is unique. There is no indication whatever that appellant entered the bank with any but the highest purpose, but there is abundant proof that when he left he was conscious of his own dishonesty. There was ample evidence that he knew he was committing a moral wrong when he took with him money that was not his. He observed the bulk of the currency given him, he saw the money counted twice and heard it counted once; the denominations of the bills could easily be seen; he had every opportunity to learn from the check that he was entitled only to $36; he inspected the check even after he received the overpayment; he had the address corrected, which indicated that he scrutinized the instrument; he was familiar with the check because it was one of a series issued in payment of compensation benefits; he saw, or had the opportunity to see, that the amount he was being paid was the sum of payments already made for those benefits; he himself said on the witness stand that he "thought [the check] was eighteen or thirty six or seventy two" dollars.

Whether appellant's misdeed in pocketing all the money, instead of returning the overpayment then and there, amounted to larceny is an interesting question and one which has been seldom discussed by the courts.

The attorney general has cited to us the treatment of the subject in 32 Am. Jur., Larceny, paragraph 26, and 36 C.J., Larceny, paragraph 129, while counsel for the appellant has given us analyses of the case cited by the authors of these texts and has alluded to two other decisions, from the English courts, to which he was led in his research. We think he is

correct in his position that the decisions from the State of Texas are of little value to us because it is apparent from the language in Hedge v. State, 89 Tex. Crim. Rep. 236, 229 S.W. 862, 14 A.L.R. 899, that the consent of the owner is immaterial under a statute of that state, while we have held that nonconsent is an essential ingredient of the crime of larceny. Albritton v. State, 81 Fla. 684, 88 So. 623; Johnson v. State (opinion filed April 23, 1946, and not yet reported). In State v. Ducker, 8 Ore. 394, 34 Am. Rep. 590, it was held that a person who received ten twenty-dollar gold pieces instead of the same number of silver pieces and upon discovering the mistake converted the overpayment to his own use was properly convicted of larceny. The case of Bergeron v. Peyton, 106 Wis. 377, 82 N.W. 291, 80 Am. St. Rep. 33, gives us little light because the court dealt there with a statute in Wisconsin making conversion by a bailee larceny, when it held that one who discounted a time check at a bank and received more money than was payable committed larceny if, upon discovering the error, he refused to refund the excess to the bank.

The Kentucky Court of Appeals had occasion to pass on a similar question in Cooper v. The Commonwealth, 110 Ky. 123, 52 L.R.A. 136, 60 S.W. 938. The facts were that a man asked the cashier of a bank for two dollars in change and received two half dollars and a roll of small coins wrapped in paper, which both thought contained twenty "nickels." The former discovered upon opening the package that it contained twenty five-dollar gold coins. The court held that the person who received the money could not be convicted unless at the time he got it he had the intention of converting any excess to his own use, and quoted with approval from a former Kentucky case, Snapp v. The Commonwealth, 82 Ky. 173. There it was said that if a man "received [money] without fraud, and as a matter of right," the recipient could not be guilty of larceny of an overpayment "although he may have [had] the *animus furandi* afterwards," and converted the excess to his own use. The Supreme Court of Alabama Expressed the view in Bailey v. State, 58 Ala. 414, that in order for a person to be convicted of larceny for receiving eleven dollars in currency

from one who intended to pay him but two dollars, it was necessary to show that at the very time the money was paid to him he knew he was receiving too much and must have at the time intended to convert the overpayment to his own use. The court concluded with this statement: "This would constitute the taking such a fraud, as would amount to larceny." In a case decided by the Supreme Court of New York (1875) it was held that if an overpayment was discovered in the bank when the man was receiving it, the crime of larceny was then and there completed, and the court indicated that even if the error was not noticed until afterward "the legal guilt of the prisoner was at that time incurred." Wolfstein v. People, 6 Hun. 121.

In Volume 12, Cox's Criminal Law Cases, page 151 (Reg. v. Jacobs), it appears that at the Middlesex Sessions a prosecuting witness had bought a ring for a penny and given the vendor a half-sovereign insted of sixpence, receiving only fivepence in change. Upon discovering the mistake the purchaser demanded the rest of his money without avail. The court held that no larceny had been committed. In the same volume at page 417 (Reg. v. Middleton) there appears a case similar to this one. A depositor at a bank received more money than he should have, and the question then was whether he was guilty of larceny. Many judges were sitting, and there was much diversity of opinion, but it seems that the conviction was upheld.

We think the cases we have consulted shade from those which, because of the application of local statutes, cast little light on our problem to the ones which seem to hold that even where the overpayment is later discovered *animus furandi* may then be formed and the recipient become guilty of larceny.

We are not prepared to say that if the appellant had innocently received from the bank more money than was required to be paid on his check and had at some future time discovered the error he would have then become a violator of the law denouncing larceny, but we do hold that when he went to the bank to exchange his check for currency knowing full well, from former experiences, the amount he was to

receive, and deliberately accepted an enormous overpayment which was obvious from the very bulk of the money handed him by the teller, he entertained the *animus furandi* the moment he picked up the money.

The jury was warranted in believing that he took more than four thousand dollars of the bank's funds knowingly, and his actions immediately afterward demonstrated that he intended to deprive the owner of it permanently. It might be argued that he got the property rightfully, not having practiced any fraud or trickery in order to obtain it, but, as the Alabama Court said, the deed of this man amounted to fraud, and he should not escape punishment on the tenuous ground that because the excess payment was made without positive action on his part and while he stood silent he was not guilty of larceny. From all the circumstances surrounding the transaction it was logical to conclude that the offense was committed when he gathered up the money and went away with it.

Affirmed.

CHAPMAN, C. J., TERRELL, BROWN, BUFORD and ADAMS and SEBRING, JJ., concur.

BROWN, J., concurring:

I am not sure from the evidence in this case that at the time the appellant accepted and took from the bank teller the money handed him he knew that a mistake had been made and that he was getting over $4000 more than he was entitled to, but on the evidence as a whole this was, as I see it, a jury question which the jury settled adversely to appellant, and therefore the trial judge should not be held in error in declining to set the verdict aside.