**UNITED STATES of America,
Appellee,**

v.

**James Hugh ROGERS, Appellant.**

No. 8214.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 9, 1960.

Decided April 4, 1961.

Elliott T. Halio, Charleston, S. C.
(Court-assigned counsel), for appellant.

Arthur G. Howe, Asst. U. S. Atty.,
Charleston, S. C. (N. Welch Morrisette,
Jr., U. S. Atty., Columbia, S. C., on the
brief), for appellee.

Before SOBELOFF, Chief Judge,
HAYNSWORTH, Circuit Judge, and
BRYAN, District Judge.

HAYNSWORTH, Circuit Judge.

The defendant has appealed from his
conviction under the "bank robbery
statute," [1] complaining that the proof did

1. 18 U.S.C.A. § 2113(b).

not show the commission of larceny and that the verdict of the jury was coerced by the Court's instructions. We think the proof did support the conviction, but that a new trial should be granted because of the possibly coercive effect of the Court's instructions designed to produce agreement of the jurors upon a verdict.

There was testimony showing that, at the request of his brother, the defendant took a payroll check, payable to the brother in the face amount of $97.92, to a bank where the brother maintained an account. In accordance with the brother's request, he asked the teller to deposit $80 to the credit of the brother's account and to deliver to him the balance of the check in cash. The teller was inexperienced. She first inquired of another teller whether the check could be credited to an account in part and cashed in part. Having been told that this was permissible, she required the defendant's endorsement on the check, and, misreading its date (12 06 59) as the amount payable, she deducted the $80 deposit and placed $1,126.59 on the counter. There were two strapped packages, each containing $500, and $126.59 in miscellaneous bills and change. The defendant took the $1,126.59 in cash thus placed upon the counter and departed.

There was also testimony that when the day's business was done, the teller who handled the transaction was found to be short in her accounts by $1,108.67, the exact amount of the difference between the $1,206.59, for which she had supposed the check to have been drawn, and $97.92, its actual face amount, and that her adding machine tape showed that she had accepted the check as having been drawn for $1,206.59.

There was corroboration from other witnesses of some phases of this story as told by the tellers and the bookkeeper.

The defendant agreed that he took the check to the bank for his brother, asked that $80 be credited to his brother's account, and that the excess be paid to him in cash. He stated, however, that he received in cash only the $17.92, to which he was entitled, denying that he had received the larger sum.

The case was submitted to the jury under instructions that they should find the defendant guilty if they found the much larger sum was placed upon the counter and was taken by the defendant with the intention to appropriate the overpayment, or if he thereafter formed the intention to, and did, appropriate the overpayment to his own use.

■ After it had deliberated for approximately four hours, the jury reported at 4:15 o'clock in the afternoon that it was unable to reach an agreement upon a verdict. Thereupon, the Court instructed the jury regarding its duty to agree, but without the ameliorating admonition that no juror should yield his conscientious conviction.[2] The jury again retired and,

2. The instruction, in full, was:

"Well, there is one other thing that I think I should say to you. While you are deliberating upon your verdict it is the duty of each of you to give careful consideration to the views that your fellow jurymen may have to present upon the testimony in the case. You should not shut your eyes and stubbornly stand upon the position you first take regardless of what may be said by the other jurymen. It should be the object of all of you to arrive at a common conclusion. And to that end you should deliberate together with calmness. It is your duty to agree upon a verdict if this is possible.

"I see no reason why you gentlemen are not just as competent, just as able, just as likely to decide the case properly as the next jury that would be called upon to hear the case. Now I do not want you to understand by what I say that you are going to be made to agree or that you are going to be kept out until you do agree. That is not the idea. But I simply wanted you to understand that it is your duty, and you must make an honest and sincere effort to arrive at a verdict. Juries should not be obstinate. They should be open minded. They should listen to the arguments of others and talk matters over fully and fairly and freely and make an honest effort, as fairminded men, to come to a proper conclusion.

"Now that is all I have to say further unless any of you gentlemen have any questions that you want to ask. Is there any questions any of the jurors want to ask?"

in a few minutes, at 4:32 o'clock in the afternoon, reported it had reached an agreement upon a verdict.

The "Allen charge" approved by the United States Supreme Court in Allen v. United States, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528, had a prior history of approval,[3] and has subsequently been approved on numerous occasions in this,[4] as in other, subordinate federal courts. Had the charge approved in Allen been given here, there would be no open question of its propriety.

The charge approved in Allen approaches the limits to which the court should go in suggesting to jurors the desirability of agreement and avoidance of the necessity of a retrial before another jury. If it went much further, or if it were stripped of its complementary reminder that jurors were not to acquiesce in the views of the majority or to surrender their well-founded convictions conscientiously held, it might readily be construed by the minority of the jurors as coercive, suggesting to them that they should surrender their views in deference to the majority and concur in what really is a majority, rather than a unanimous, verdict.

That the Allen charge, itself, approaches ultimate permissible limits is indicated by the cases requiring new trials when the charge has been given

after the court has learned, by inquiry, that the division in the jury is substantially unequal. The United States Supreme Court in Burton v. United States, 196 U.S. 283, 25 S.Ct. 243, 49 L.Ed. 482, expressed its disapproval of the court's inquiry as to the numerical division in the jury when it was followed by the Allen charge. In Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345, it reversed a judgment because of the combination of these two circumstances.[5]

The fact that the Allen charge was preceded by an inquiry which disclosed that the jurors were divided between a substantial majority on the one hand and a substantial minority on the other could add but little to the potentially coercive effect of the charge. Whether the court knew how the jurors were divided, or had obtained such information in response to its own inquiry, if, in fact, only a small minority of the jurors stood in disagreement with their fellows, they would necessarily take the language of the charge as being directed at them and suggesting that they, rather then the majority, reconsider their views. Moreover, the preliminary inquiry is not such a purposeless thing as has sometimes been suggested. Information as to whether the jury is divided equally or substantially so, or very unequally, is useful to the trial judge in deciding

3. Commonwealth v. Tuey, 1851, 8 Cush., 62 Mass. 1; State v. Smith, 1881, 49 Conn. 376; Allis v. United States, 155 U.S. 117, 15 S.Ct. 36, 39 L.Ed. 91, affirming United States v. Allis, C.C.E.D. Ark., 73 F. 165.

4. Rhodes v. United States, 4 Cir., 282 F. 2d 59; Orthopedic Equipment Co. v. Eutsler, 4 Cir., 276 F.2d 455; Milanovich v. United States, 4 Cir., 275 F.2d 716; Orton v. United States, 4 Cir., 221 F.2d 632; Wolin v. United States, 4 Cir., 211 F.2d 770; Lias v. United States, 4 Cir., 51 F.2d 215, affirmed 284 U.S. 584, 52 S.Ct. 128, 76 L.Ed. 505; Johnson v. United States, 4 Cir., 5 F.2d 471.

5. In Brasfield, the Supreme Court makes no reference to an Allen charge. That one was given, however, appears in the opinion of the Court of Appeals which

the Supreme Court was reviewing, 9 Cir., 8 F.2d 472. The opinion in Brasfield states the problem in terms of a conflict between the circuits as to whether the Supreme Court's comments in Burton were hortatory or mandatory. In each of the cases cited to establish the conflict, as in Burton, the inquiry was accompanied by an instruction on the duty to reach agreement. In cases subsequent to Brasfield, where the inquiry was not accompanied by an Allen charge, i. e. made when the judge was considering whether arrangements should be made for a meal for the jurors, the inquiry has been held harmless. Beale v. United States, 5 Cir., 263 F.2d 215; Butler v. United States, 5 Cir., 254 F.2d 875; Maloney v. Tunnell, 3 Cir., 218 F.2d 705; contra Jordan v. United States, 9 Cir., 22 F.2d 966.

whether to declare a mistrial or to ask the jury to deliberate further. If the division is very unequal, ultimate agreement may appear more probable, and thus make more appropriate his request that they deliberate further and, in that connection, the giving of the Allen charge.

Precedent inquiry as to the jury's division is such a trifling addition to the impact of the Allen charge that Wigmore has said in reference to it, "a finical spirit has sometimes rebuked such questions and has even not scrupled to delay the course of justice for this petty cause," (citing the Burton and Brasfield cases).[6]

Instructions have been held to be erroneous when the Allen charge has been supplemented by a quotation from the opinion of the Supreme Court in the Allen case,[7] an addition in the measured words of the Supreme Court which may lend additional emphasis to the desirability of agreement, but which does not remove or destroy the force of the reminder that acquiescence is not required, and that reasoned opinions and firm convictions thoughtfully reached should not be abandoned.

If such slight additions to the Allen charge as precedent inquiry revealing an unequal division in the jury or a quotation from the opinion of the Supreme Court of the United States, converts an otherwise proper and appropriate charge into one that is prejudicial and erroneous, how much more objectionable it is if the reminder that makes the Allen charge tolerable in the first place is omitted altogether. Here what was given was not the Allen charge, but only a paraphrase of that portion of it which directs the attention of the jurors to their duty to agree, without the reminder of their duty of dissent if dissent is founded upon reasoned conclusions reasonably arrived at and reasonably held. Without reference to both sides of the coin, a strong statement of the duty of agreement may readily be construed by those jurors in the minority as requiring a deferential surrender to the views, however unreasoned they may be, of the majority.

There is indication that the jurors in the minority in this instance did put such a construction upon the court's charge. The jury had reported itself hopelessly in disagreement and unable to reach a verdict when the supplemental charge was given. Within a few minutes thereafter the jurors reported themselves in agreement. The time interval was quite long enough for acceptance of a theory of majority rule, but was hardly long enough to have permitted a painstaking re-examination of the views which the minority had held steadfastly until the charge was given.

Recently, in Rhodes v. United States, 4 Cir., 282 F.2d 59, 62, and in Orthopedic Equipment Co. v. Eutsler, 4 Cir., 276 F.2d 455, this court took pains to point out in the language of Judge Sobeloff:

"'It is proper for the judge to admonish jurors who are in disagreement to re-examine their opin-

---

6. VIII Wigmore on Evidence 3d Edition, pp. 680–681 n. 3; see, also, United States v. Samuel Dunkel & Co., Inc., 2 Cir., 173 F.2d 506. The court in Samuel Dunkel & Co., Inc. followed the lead of the Supreme Court, but with expressed reluctance and with reference to the criticism of the rule. Such reluctance is not apparent in the opinion in other cases following Brasfield. Jacobs v. United States, 8 Cir., 279 F.2d 826; Anderson v. United States, 8 Cir., 262 F.2d 764; Cook v. United States, 5 Cir., 254 F.2d 871; Bowen v. United States, 8 Cir., 153 F.2d 747; Spaugh v. United States. 9 Cir., 77 F.2d 720; Berger v. United States, 10 Cir., 62 F.2d 438; Jordan v. United States, 9 Cir., 22 F.2d 966. Where inquiry revealed the jury to have been equally divided, see Anderson v. United States, 8 Cir., 262 F.2d 764; compare Berger v. United States, 10 Cir., 62 F.2d 438; Jordan v. United States, 9 Cir., 22 F.2d 966.

7. Stewart v. United States, 8 Cir., 300 F. 769; Nigro v. United States, 8 Cir., 4 F.2d 781; Chicago & E. I. Ry. Co. v. Sellars, 8 Cir., 5 F.2d 31; see, however, Dwyer v. United States, 2 Cir., 17 F.2d 696.

ions in light of the contrary opinions of their fellows, provided it is made equally clear that the jury's verdict must represent the final judgment of each juror, and not merely his acquiescence in a majority view of which he remains conscientiously unconvinced.' "

■ We have thus indicated that the permissibility of a direction to jurors to re-examine their views in the light of those of their fellows is dependent upon the moderating reminder of their own individual responsibility and the necessity that any verdict be that of each of the jurors and not just that of a majority.[8] When the moderating condition which makes the direction to re-examine their views permissible, and desirable in many cases, is omitted, then the direction becomes so likely to be coercive, that a verdict rendered promptly thereafter should not be allowed to stand.

Because the "Allen charge" was incomplete and one-sided, and was followed immediately by a verdict of a jury which had just reported itself hopelessly deadlocked, we think a new trial is required.

Since the other questions, directed to the nature of the offense, will arise necessarily upon a retrial, we address ourselves to them.

■ We accept the defendant's premise that paragraph (b) of the bank robbery act[9] reaches only the offense of larceny as that crime has been defined by the common law. It does not encompass the crimes of embezzlement from a bank, reached by another statute,[10] or obtaining goods by false pretense. That this is so is indicated by the use of the words, "(w)hoever takes and carries away, with intent to steal and purloin, * * *," borrowed from the Act of April 30, 1790,[11] which had been construed as a larceny statute.[12] It is further indicated by the title of the act[13] and its legislative history.[14]

■ The defendant's premise that the prosecution was required to . show the commission of larceny does not lead,

8. See, also, Peterson v. United States, 9 Cir., 213 F. 920, 925; Quong Duck v. United States, 9 Cir., 293 F. 563, 565, Ross, Circuit Judge, concurring. But see Hill v. Wabash Ry. Co., 8 Cir., 1 F. 2d 626, 632.

9. 18 U.S.C.A. § 2113(b) :
"Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, or any savings and loan association, shall be fined not more than $5,000 or imprisoned not more than ten years, or both; or
"Whoever takes and carries away, with intent to steal or purloin any property or money or any other thing of value not exceeding $100 belonging to, or in the care, custody, control, management or possession of any bank, or any savings and loan association, shall be fined not more than $1000 or imprisoned not more than one year, or both."

10. 18 U.S.C.A. § 656.

11. C. 9, § 16, 1 Stat. 112, 116. (Now 18 U.S.C.A. § 661.)

12. United States v. Davis, C.C., Fed.Cas. No.14,930, 5 Mason 356; Dunaway v.

United States, 10 Cir., 170 F.2d 11. See, also, IV Blackstone, Commentaries (1st ed.) 232; Jolly v. United States, 170 U.S. 402, 18 S.Ct. 624, 42 L.Ed. 1085, and the dissenting opinion of Judge Frank in United States v. Jerome, 2 Cir., 130 F. 2d 514, at page 524.

13. "To Amend the Bank-Robbery Statute to Include Burglary and Larceny."

14. Following recommendations of the Attorney General that robbery of a national bank be made a federal offense, a bill, S. 2841 was passed by the Senate which included in its § 2 a broadly defined statutory offense and in § 3 the common law crime of burglary. The Committee on the Judiciary of the House of Representatives recommended the deletion of §§ 2 and 3 from the Senate bill. H.Rep. 1461, 73d Cong. 2d Sess. p. 2. This recommendation was adopted by the House, 78 Cong.Rec. 8182, and the bill, retaining the robbery section only, was enacted on May 18, 1934. 48 Stat. 783.

Thereafter, the Attorney General recommended an amendment of the bank robbery statute to include the crimes of burglary and larceny. H.Rep. 732, 75th Cong., 1st Sess. pp. 1–2; S.Rep. 1259, 75th Cong., 1st Sess. pp. 1–2. Without any effort to expand the reach of the

however, to the conclusion that he should have been acquitted. The indictment charged larceny and the evidence offered by the prosecution, if accepted by the jury, proved the commission of that crime, not false pretense, embezzlement or some other lesser offense.

■ An essential element of the crime of larceny, the " 'felonious taking and carrying' away the personal goods af another," [15] is that the taking must be trespassory. It is an invasion of the other's right to possession, and therein is found the principal distinction between larceny and other related offenses.[16]

■ It has long been recognized, however, that when the transferor acts under a unilateral mistake of fact, his delivery of a chattel may be ineffective to transfer title or his right to possession. If the transferee, knowing of the transferor's mistake, receives the goods with the intention of appropriating them, his receipt and removal of them is a trespass and his offense is larceny.

Such a situation was presented in Regina v. Middleton, 28 Law Times (N.S.) 777, 12 Cox C.C. 417 (1873). There it appeared that the defendant had a credit balance of 11 s. in a postal savings account. He obtained a warrant for the withdrawal of 10 s. which he presented to the postal clerk. The clerk mistakenly referred to the wrong letter of advice, one which had been received in connection with the prospective withdrawal of a much larger sum by another depositor. The clerk then placed upon the counter a 5 L note, 3 sovereigns, a half crown and silver and copper amounting altogether to 8 L 16 s. 10 d. The defendant gathered up the money and departed. The jury found that the defendant was

aware of the clerk's mistake and took the money with intent to steal it. His conviction of larceny was affirmed by the Court of Criminal Appeals, the fifteen judges dividing eleven to four.

The majority of the judges in Middleton's case were divided among themselves as to the basis for the conclusion that there was the requisite taking. Seven of them were of the opinion that, because of the clerk's mistake as to the identity of the depositor, no legal interest in the money passed to Middleton. Three of them thought that the clerk had no authority to transfer to Middleton any interest in any money in excess of 10 s. One judge was of the opinion that the delivery was not complete when the clerk placed the money upon the counter and that Middleton's act of picking it up and removing it was a taking.[17]

Subsequently, it appears to have become settled in England that, if the initial receipt of the chattel is innocent, its subsequent conversion cannot be larceny, but, if the recipient knows at the time he is receiving more than his due and intends to convert it to his own use, he is guilty of larceny. See Regina v. Flowers, 16 Q.B. 643 (1886). That is the established rule of the American cases.

In Wolfstein v. People, 1875, 6 Hun, N.Y., 121, it appeared that the defendant presented for payment a French bill of exchange for $74 in gold. The teller, unfamiliar with French, misread the bill and paid the defendant $742. The defendant knew, at the time of his receipt of the larger sum, that he was entitled only to $74. It was held that he was guilty of larceny.

The same result has been reached in similar cases.[18]

bill to include other crimes, 81 Cong. Rec. 4656, 5376, it was enacted after adoption of an amendment relating to punishment.

15. IV Blackstone, Commentaries (1st ed., 1769) 230.

16. See 88 Am.St.Rep. 559, 561; 32 Am. Jur., Larceny § 2.

17. Here, also, Rogers picked up the money from the counter and "took it" in this sense.

18. Sapp v. State, 1946, 157 Fla. 605, 26 So.2d 646; Territory v. Lee, 1926, 29 Hawaii 30. See, also, Bailey v. State, 58 Ala. 414; Fulcher v. State, 1894, 32 Tex.Cr.R. 621, 25 S.W. 625; Cooper v. Commonwealth, 1901, 110 Ky. 123, 60

■ The District Court went too far, however, when it told the jury it might convict if, though his initial receipt of the overpayment was innocent, the defendant thereafter formed the intention to, and did, convert the overpayment.[19]

The charge as given finds support in earlier cases. There was a dictum to that effect in Wolfstein v. People, 1875, 6 Hun, N.Y., 121, upon which the Oregon Court relied in deciding State v. Ducker, 8 Or. 394, 34 Am.Rep. 590.[20] In England, a similar result was reached in Regina v. Ashwell, 16 Q.B. 190 (1883), Lord Coleridge declaring there could be in law no delivery and no receipt if giver and receiver labored under a mutual mistake as to the thing being given and received. Subsequent cases in the United States [21] and in England,[22] however, have consistently held that, if there is a mutual mistake and the recipient is innocent of wrongful purpose at the time of his initial receipt of the overpayment, its subsequent conversion by him cannot be larceny.

■ Upon the retrial, therefore, the jury should be instructed that among the essential elements of the offense are (1) that the defendant knew when he received the money from the teller or picked it up from the counter that it was more than his due and (2) that he took it from the bank with the intention of converting it.

The judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

---

S.W. 938, 52 L.R.A. 136; Commonwealth v. Hays, 1859, 14 Gray, Mass., 62. The factual situation in Sapp v. State was almost identical to that with which we are concerned. Sapp presented for payment a check for $36, an instalment of workmen's compensation benefits to which he was entitled. The check bore other information upon its face, the policy number, the period covered by the current payment and an accumulative "Total Paid to Date—$4,328.37." The teller, reading the total paid to date as the amount of the check, paid Sapp $4,-328.37. Sapp's conviction of larceny was affirmed.

19. Since the overpayment was so large and obvious to one who knew the amount of the check, the error may have been harmless, as was held in Sapp v. State, supra. Upon the retrial, however, the jury should be properly instructed.

20. See, also, Bergeron v. Peyton, 1900, 106 Wis. 377, 82 N.W. 291.

21. Bailey v. State, 58 Ala. 414; Fulcher v. State, 1894, 32 Tex.Cr.R. 621, 25 S.W. 625; Cooper v. Commonwealth, 1901, 110 Ky. 123, 60 S.W. 938, 52 L.R.A. 136; People v. Miller, 1886, 4 Utah 410, 11 P. 514; Territory v. Lee, 1926, 29 Hawaii 30; Sapp v. State, 1946, 157 Fla. 605, 26 So.2d 646.

22. Regina v. Flowers, 16 Q.B. 643 (1886). See, also, Regina v. Jacobs, 18 Cox C.C. 267 (1872).