**UNITED STATES of America**

v.

**Lester POSNER.**

**Crim. No. HM75–0120.**

United States District Court,
D. Maryland.

Feb. 20, 1976.

Jervis S. Finney, U. S. Atty. for Dist. of Maryland, Joseph M. Fairbanks, Asst. U. S. Atty., Baltimore, Md., for the United States.

Charles G. Bernstein, Federal Public Defender for Dist. of Maryland, and Gerald M. Richman, Asst. Federal Public Defender, Baltimore, Md., for defendant Lester Posner.

## MEMORANDUM AND ORDER

HERBERT F. MURRAY, District Judge.

This case came before the Court on January 23, 1976, for trial on a Stipulation of Facts filed by the parties. At the close of the trial, the government moved to re-open the case in order to introduce further evidence; the defendant moved for a judgment of acquittal.

The indictment in this case charges the defendant, Lester Posner, with "bank larceny" of approximately $183,-382.36 from the Equitable Trust Co., Hampden Branch, Baltimore, Maryland, in violation of 18 U.S.C. § 2113(b) and (f). In essence, the facts show that the defendant, a customer of the above bank, became aware of the fact that the bank was depositing funds to his account in error, and that with this knowledge and the intent to convert those funds, the defendant withdrew over $180,000 of these funds over a fifteen-month period, and in fact applied the withdrawn funds to his own personal use. The primary question presented by this case is whether these activities constitute a violation of 18 U.S.C. § 2113(b), or constitute some other crime not punishable under federal law.

## FACTS

The parties entered into the following stipulation of facts, which were admitted as the complete facts by the parties:

1. At all material times alleged herein, the Equitable Trust Company, Hampden Office, 902 West 36th Street, Baltimore, Maryland, was a 'bank' as defined in Title 18, Section 2113(f) of the United States Code, and its deposits were insured by the Federal Deposit Insurance Corporation under Certificate Number 1888–1, issued December 23, 1969.

2. Effective January 1, 1973, the Maryland State Lottery Agency (hereinafter referred to as 'The Lottery') was created by Chapter 365, 1972 Laws of Maryland, and by an amendment to Article III, Section 36 of the Maryland Constitution which was ratified by the voters of the State of Maryland on November 7, 1972.

3. Approximately 55 banks within the State of Maryland are designated as distribution and collection centers for the Lottery. Pursuant to the procedures of the Lottery, Lottery tickets are distributed by these banks to sales agents each week. Each agent is required to report to his designated bank each week to remit his receipts for tickets sold the previous week, return unsold tickets, and pick up his tickets for the next week. Each agent receives a commission based on a percentage of his weekly receipts.

4. The sale of Lottery tickets began on or about May 15, 1973. From and after that date, the Equitable Trust Company, Hampden Branch, was a bank designated to distribute Lottery tickets and collect receipts from their sale. In this connection, a checking account entitled Maryland State Lottery Agency, Account Number 605 2093 1 (hereinafter referred to as 'Lottery Account') was maintained by the Equitable Trust Company, Hampden Branch, for deposit of the weekly receipts.

5. From and after May 15, 1973, the Equitable Trust Company, Hampden

Branch, had approximately 25 Lottery agents who picked up their tickets and turned in the receipts at that bank on Tuesday of each week. Each agent was required to fill out and sign a 'Bank/Agent Form' indicating the number of tickets returned, number sold, total value of those sold, the commission, and the total amount of money being remitted (receipts less commission). After all of the agents had reported on each Tuesday, an employee of the bank was then required to fill out a 'Bank/Agent Form' indicating the total remittance for all the agents. The total remittance was then deposited in the Lottery Account.

6. From and after May 15, 1973, Lester Posner was a duly designated agent of the Lottery assigned to the Equitable Trust Company, Hampden Branch. Posner sold Lottery tickets at his place of business, the Chestnut Foodrite Market, 3535 Chestnut Avenue, Baltimore, Maryland. On or about May 9, 1973, Posner opened a checking account at the Equitable Trust Company, Hampden Branch, entitled 'Chestnut Foodrite Lottery Account', Account Number 606 0673 5 (hereinafter referred to as 'Posner Account'). Posner's purpose for the Posner Account was to deposit each week his total receipts from the sale of Lottery tickets, and then to draw a check remitting his total amount due for that week (receipts less commission). During the period from May 23, 1973 through September 11, 1973, the largest deposit in the Posner Account was $437.50, and the smallest was $300.00.

7. Sometime prior to September 11, 1973, a supply of deposit tickets for the Lottery Account was received for use by the Equitable Trust Company, Hampden Branch. These deposit tickets were mistakenly pre-encoded with the account number of the Posner Account. As a result of the use of these deposit tickets by employees of the bank, each week from September 11, 1973 through and including December 12, 1974, the total weekly remittance from all the lottery agents at the Equitable Trust Company, Hampden Branch, was deposited in the

Posner Account rather than the Lottery Account. The largest such weekly deposit during this period was $4,287.08, and the smallest was $2,005.90. The total amount mistakenly deposited in the Posner Account during this period of time was approximately $183,382.36.

8. During the period from October 12, 1973 to December 5, 1974, Posner withdrew a total of approximately $177,444.12 of the Lottery funds which had been mistakenly deposited to the Posner Account. These withdrawals were in the form of fourteen separate checks drawn on the Posner Account and signed by Posner. The following is a list of the amounts and dates of these checks:

| Amount | Date |
|---|---|
| $ 9,000.00 | 10/12/73 |
| 32,544.12 | 12/13/73 |
| 3,000.00 | 1/15/74 |
| 20,000.00 | 3/12/74 |
| 6,700.00 | 3/15/74 |
| 10,000.00 | 4/9/74 |
| 11,500.00 | 5/7/74 |
| 10,000.00 | 6/7/74 |
| 9,200.00 | 7/10/74 |
| 16,000.00 | 8/7/74 |
| 12,000.00 | 9/9/74 |
| 10,500.00 | 10/7/74 |
| 12,000.00 | 11/6/74 |
| 15,000.00 | 12/5/74 |
| $177,444.12 | |

9. At the time each of the above-mentioned checks was drawn by Lester Posner, he knew the funds mistakenly credited to the 'Posner Account', as set forth in paragraphs 7 and 8 above were not rightfully his, and he drew each check with the intention of converting those funds to his own use. Each of the checks was honored and paid by the Equitable Trust Company, and the funds thus paid were in fact applied by Posner to his own use.

10. The Lottery funds withdrawn by Posner from the Posner Account have never been recovered by the Lottery or the Equitable Trust Company from Posner or any other source. At the present

time, the Posner Account is closed with a balance of approximately $7,366.84.

The parties further stipulated during the course of the trial that the six checks drawn between 7/10/74 and 12/5/74 were negotiated at the Maryland National Bank by deposit to Posner's account by Posner; that the check dated 12/13/73 was deposited to the Commonwealth National Bank in Harrisburg, Pennsylvania; and the remainder was made out to cash, or to Chestnut Foodrite Account or Foodrite payroll account.

## MOTION TO REOPEN THE CASE

During the course of the trial, the government, as a consequence of questions posed by the Court, became concerned that there was no evidence showing that the defendant was ever physically present within the bank. At the end of the trial, the government, seeking to correct what was thought to be a defect in its proof, moved to reopen the case to take further evidence.

The granting of such a motion is within a court's sound discretion. Moore, *Federal Practice,* ¶ 59.04[13]. While courts have granted motions to reopen in civil cases submitted on an agreed statement of facts, *St. Mary's Bank v. Cianchette,* 99 F.Supp. 994, 996 (D.Me.1951), and in criminal non-jury cases, *Haugen v. United States,* 153 F.2d 850 (9th Cir. 1946), to correct a defect in formal proof, the Court has not been referred to and is unaware of any criminal case tried on stipulated facts in which such a motion has been granted. In considering such a motion, the Court must weigh the prejudice which would inure to the non-moving party. In the instant case, it would appear that the prejudice would be substantial. The defendant waived his right to trial by jury on the assumption that he would be tried by the Court on a known set of facts stipulated to by him and his counsel. To grant the government's motion would be to impose upon the defendant a risk he never reasonably anticipated in making his decision to waive a trial by jury.

Furthermore, it seems doubtful that there is any evidence which the government could produce in stipulated form, since defense counsel refuses to stipulate to any evidence tending to show the presence of the defendant in the bank at any time. The government chose to try this case on stipulated facts; it cannot at this late stage change its mind to present evidence outside of those stipulated facts. In any event, the failure of the government to present evidence showing the defendant's presence in the bank, in the Court's view, does not harm its case, for reasons discussed *infra.* Accordingly, the government's motion to reopen will be denied.

## LEGAL DISCUSSION

### 1. *Scope of 18 U.S.C. § 2113(b)*

The threshold consideration in determining whether the defendant's actions constitute a violation of 18 U.S.C. § 2113(b) is whether the scope of that provision reaches all felonious takings from a federally insured banking institution, or only those takings which constitute "larceny" at common law. Title 18, § 2113(b) provides, in pertinent part:

(b) whoever takes, and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $5,000 or imprisoned not more than 10 years, or both; * * *

The Circuits apparently are divided on the issue of the scope of § 2113(b). The Second and Fifth Circuits have held that the provision extends to all felonious takings, applying the rationale advanced by the Supreme Court in *United States v. Turley,* 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957), holding that the word "stolen" as used in the Dyer Act (18 U.S.C. § 2312) incorporates " . . . all felonious takings . . . with intent to deprive the owner of the rights and benefits of ownership, regardless of

whether or not the theft constitutes common-law larceny." *United States v. Fistel*, 460 F.2d 157 (2d Cir. 1972); *United States v. Ferraro*, 414 F.2d 802 (5th Cir. 1969); *Williams v. United States*, 402 F.2d 258 (5th Cir. 1968), *cert. denied*, 396 U.S. 1017, 90 S.Ct. 582, 24 L.Ed.2d 509 (1970); *Thaggard v. United States*, 354 F.2d 735 (5th Cir. 1965), *cert. denied*, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966). On the other hand, both the Fourth Circuit and the Ninth Circuit have held that § 2113(b) reaches only larceny as that term is defined at common law. *Bennett v. United States*, 399 F.2d 740 (9th Cir. 1968); *LeMasters v. United States*, 378 F.2d 262 (9th Cir. 1967); *United States v. Rogers*, 289 F.2d 433 (4th Cir. 1961). *See also United States v. Mangus*, 33 F.Supp. 596 (N.D. Ind.1940); *U. S. v. Starr*, 48 F.Supp. 910 (S.D.Fla.1943). The Court in *Rogers*, citing legislative history, held:

> We accept the defendant's premise that paragraph (b) of the bank robbery act reaches only the offense of larceny as that crime has been defined by the common law. It does not encompass the crime of embezzlement from a bank, reached by another statute, or obtaining goods by false pretenses.

*Id.*, 289 F.2d at 437 [footnotes omitted].

The Court of course is governed by the holding of *United States v. Rogers* despite the subsequent contrary holdings of the Fifth and Seventh Circuits. The legislative history of § 2113(b), so meticulously reviewed by Judge Madden in *LeMasters, supra*, clearly distinguishes § 2113(b) from the Dyer Act provision which was before the Supreme Court in the *Turley* case, on which the Fifth and Second Circuits rely. The Court holds that defendant here, to be guilty of a violation of 18 U.S.C. § 2113(b), must have committed common law larceny.

As in the *Rogers* case, the conclusion that the bank larceny statute is limited in scope does not compel the conclusion that the defendant's motion for judgment of acquittal should be granted. The further and more difficult inquiry remains whether the defendant's conduct would fall under the common law definition of larceny.

### 2. Common law larceny distinguished from obtaining property by false pretenses

■ While the definition of "larceny" necessarily appears in various formulations, it has been defined as "the felonious taking by trespass and carrying away by any person of the personal goods or things of another from any place, without the latter's consent and with the felonious intent permanently to deprive the owner of his property and to convert it to the taker's own use." 50 Am.Jur.2d Larceny § 2. The primary element which distinguishes the crime of larceny from the crime of obtaining property by false pretenses is the element of trespassory taking.[1] Perkins, *Criminal Law*, at 245; *Rogers*, 289 F.2d at 438; 50 Am.Jur.2d Larceny § 7. Whether or not there is a trespassory taking depends on the intent of the owner in parting with possession of the goods in question. If the owner intended to part with possession only, intending to retain title (defined as the expectation that the property will be returned to him or be disposed of in accordance with his directions), the taking

---

1. As Perkins notes in his work on Criminal Law, at 246:

> It must be emphasized that a 'trespassory taking' of a chattel has no reference to a trespass on or to real estate. Such a trespass is neither required, nor sufficient, for larceny. An altogether different kind of trespass is involved here—the *trespass de bonis asportatis*, (trespass for goods carried away) to use the ancient label. For this trespass it is necessary to find that someone other than the wrongdoer had possession of the money or chattel, and that this possession was brought to an end by a taking by the wrongdoer (or by another at his instigation), under such circumstances as to amount in law to trespass. In general it may be said that the taking of possession from another is always a trespass unless the other consents thereto, or there is some special authority for the taking,—as for example where a sheriff takes a chattel under a writ of attachment.

of his goods permanently with the requisite intention to do so at the time of the taking constitutes larceny, even if the consent to part with possession was fraudulently induced. But if the owner intended to part with title and possession of his goods, he has consented to the taking and there can be no larceny, even if the consent to pass title was fraudulently induced. This is so because there is a lack of the requisite "trespassory taking"; the title having passed to the taker, there is "no one other than himself in whom an indictment for larceny can lay the ownership and possession of the thing taken." 52A C.J.S. Larceny § 36.

█ It would be difficult to argue that Equitable Trust did not intend to part with both title and possession when it honored the defendant's checks. It obviously had no expectation that the funds would be returned or would be disposed of in accordance with its directions. It is also obvious that good title to those funds would pass from Posner to any third party bona fide purchaser for value without notice. Thus, if the consent to part with the money was induced by the defendant's fraud or trick, the defendant would not be guilty of larceny, but of obtaining property by false pretenses—an offense not punishable under 18 U.S.C. § 2113(b).

3. *Common law larceny: obtaining property through owner's unilateral mistake*

█ The common law, however, seems to have developed a different analysis when a taker has obtained the consent to pass title and possession, not through fraud or misrepresentation, but by the owner's unilateral mistake. In cases where the owner mistakenly gives the taker more than the taker was due, if the taker discovers the error before he acquires lawful possession, it is his duty to disclose the error, and if he takes the excess with the intent of converting it to his own use and without disclosing the error, the taking is a constructive trespass and sufficient for larceny. 2 Wharton, *Criminal Law and Procedure* (Anderson ed.) § 478; 50 Am.Jur. Larceny § 26. The rationale for this treatment seems to be that the owner has no intent to consent to the transfer of title where he is under a mistake, and therefore, retains constructive possession of the goods and title does not pass. *Territory v. Lee*, 29 Haw. 30 (1926); *Wolfstein v. People*, 6 Hun. 121 (N.Y.1875); *Regina v. Middleton*, 28 Law Times (N.S.), 777, 12 Cox C.C. 417 (1873).

At least one commentator, Professor Perkins, has strongly criticized this treatment[2] and suggested that a proper analysis should distinguish between two types of mistakes: mistake in the *factum* and mistake in the inducement. Where X delivers $100 to Y, intending to deliver only $50 and mistakenly thinking that the amount delivered is $50, there is a mistake as to the actual identity of the goods passing. In such a case, there is mistake in the *factum*, and while possession may pass, title does not because there is no consent to part with title to the excess $50, and the taking of the overpayment with the requisite intent constitutes larceny. But where X delivers $100 to Y, intending that Y receive $100 but being mistaken as to the amount actually owed Y, Perkins argues that this is a mistake in the inducement[3] and title passes because there is an intent to consent to give away absolutely the money actually transferred. In such cases, Perkins argues, there can be no larceny because there is no element of trespassory taking.

**2.** *See also* 2 Russell on Crime (11th ed. J. W. Cecil Turner) 1099, criticizing the early decision of *Regina v. Middleton*, cited *supra*. *See generally*, Fletcher, The Metamorphosis of Larceny, 89 Harv.L.Rev. 469, at 515–518 (1976).

**3.** By mistake in the inducement, Perkins does not mean that inducement was by the taker.

Rather, because of his own mistake as to what should be done, the owner has induced to hand over his property with intent that the title should pass. The mistake "induced" the intentional act. Perkins, at 256, note 81.

While Perkins' analysis has a good deal of force, it does not generally seem to have been accepted in the decided cases. Perkins notes,

> Some courts have overlooked the basic distinction between these two different kinds of mistake—mistake in the *factum* and mistake in the inducement—and have reached the result that the recipient who recognizes the mistake at the time, and fraudulently takes advantage of it, is guilty of larceny whichever type of mistake is made.

Perkins, p. 256; footnotes omitted. One of the earliest cases dealing with mistake was *Wolfstein v. People*, 6 Hun. 121 (N.Y.1875). In that case, the holder of a draft in French for $74, on presenting it to the bank for payment, was given $742 by a teller unable to read French. The teller believed that the note actually called for the payment of $742, and thus clearly intended on payment to pass title as well as possession—i. e., it was a mistake in the inducement, to use Perkins' term. Nevertheless, the Court held that it was larceny despite the "consent":

> The money, in excess of that which he is entitled to receive, is taken without the owner's consent, and that which is thus taken is appropriated to the taker's use with intent, fraudulently, to deprive the owner thereof. These two elements make the crime of theft, and they are both present here.
>
> It will not do to say that the owner parts with the property voluntarily, and therefore there is no unlawful taking. There may be the physical act of the owner handing that which is his to another, but there is absent the intellectual and intelligent assent to the transfer upon which the consent must necessarily depend. 6 Hun. 121, 122.

Accord, *Regina v. Middleton*, 28 Law Times (N.S.) 777, 12 Cox C.C. 417 (1873); *Bergeron v. Peyton*, 106 Wis. 377, 82 N.W. 291 (1900); *Territory v. Lee*, 29 Haw. 30 (1926); *Sapp v. State*, 157 Fla. 605, 26 So.2d 646 (1946). Cf. *Hedge v. State*, 89 Tex.Cr.R. 236, 229 S.W. 862 (1921).

The *Rogers* case itself seems to reject Perkins' distinction. In *Rogers*, the defendant received more money than that which was called for by the check which he had presented for payment as a consequence of the bank teller's error in reading the check. Thus, in *Rogers*, the mistake was a mistake in the inducement; the teller clearly intended that the amount he actually tendered to Rogers should pass to Rogers. But the Fourth Circuit, citing *Middleton* and *Wolfstein*, upheld Rogers' conviction for larceny, stating:

> It has long been recognized, however, that when the transferor acts under a unilateral mistake of fact, his delivery of a chattel may be ineffective to transfer title or his right to possession. If the transferee, knowing of the transferor's mistake, receives the goods with the intention of appropriating them, his receipt and removal of them is a trespass and his offense is larceny. 289 F.2d at 438.

The Court also cited in a footnote the *Sapp* and *Lee* decisions as supporting authority. The holding of the *Rogers* case leaves no question that the Fourth Circuit's view of larceny at common law does not accord with Professor Perkins' analysis. *Rogers* holds that the taking of goods delivered as a consequence of either kind of mistake is a larceny when taken with the requisite criminal intent to deprive permanently the owner of possession and with the intent to convert the goods to his own use. The mistaken consent of the owner will not stand as a bar to a conviction of larceny because the element of trespassory taking is satisfied by the constructive trespass created by the law.

### 4. The "Taking" in the present case: by mistake or by fraud?

The question which remains is whether the taking in the present case was a consequence of a unilateral mistake on the part of the bank—in which case the offense is larceny under *Rogers*—or whether it was a consequence of the defendant's fraudulent misrepresentations,

in which case the offense may be obtaining property by false pretenses, but not larceny.

Preliminarily, one difference between the facts here and those in the common mistake cases is that the defendant here was not a passive beneficiary of the transferor's mistake, but rather an active agent causing the mistake by presenting checks for payment. Arguably, the presentation of checks for payment could constitute a misrepresentation that the funds in the account to be drawn upon were legally those of the drawer.

But further consideration would indicate that this difference does not distinguish the present case from the more common mistake cases. In the common mistake case, the transferor, misreading the amount to be paid on a check, gives the transferee more than the check actually calls for. That mistake, like the mistake here in erroneously crediting the defendant's checking account, was unilateral and without any intervention on the part of the transferee. The crime does not occur until the transferee takes advantage of that unilateral mistake, either through willfully accepting and carrying away the overpayment, as in the common mistake case, or, as here, by writing a check on that account. In both cases, there is a "misrepresentation" that occurs at the time of the taking. When the transferee in the common mistake case accepts the overpayment without disclosure of the fact of overpayment, he represents by his silence that he is lawfully entitled to the funds he has actually received. Similarly, in the present case, the defendant "misrepresented" by the presentation of his checks for payment that he was entitled to the funds in his account. The misrepresentation is for all intents and purposes the same as in the common mistake case, and the Court can find no distinction between the facts of this case and those of the common mistake case which would compel it to treat it any differently than a mistake case.

Furthermore, this is not a case wherein the defendant misrepresented his identity, or committed any overt fraudulent act such as forging of checks. Such activities might well fall within the scope of actions traditionally recognized as fraudulent, and thus not punishable under common law larceny or under 18 U.S.C. § 2113(b). Cf. *Mangus, supra,* and *LeMasters, supra.*

### 5. Taking by Innocent Agent

One possible distinction between the present case and the common mistake case is that the defendant here did not personally enter the bank, receive the excess funds, and carry them from the bank. Arguably, there has been no "taking and carrying away". The factual distinction, however, does not compel that conclusion. It is well established that a "taking" may be accomplished by the use of an innocent agent acting under the control and direction of the taker where the goods finally come into the possession of the taker and are converted to his use. Perkins, *Criminal Law,* at 244; Wharton, *Criminal Law,* § 472; 50 Am.Jur.2d Larceny § 13; 52A C.J.S. Larceny § 7C. In the present case, the defendant, through the use of a negotiable instrument, directed various banks to remove the funds from the Equitable Trust account and place them in various other accounts outside of that bank. In acting as collection agents, the banks were obviously operating at the control and direction of the defendant; the funds came into the defendant's possession and were converted to his own use. The Court holds that this conduct is sufficient to establish a "taking" and an "asportation" of the funds in the Equitable Trust account. Cf. *People v. Maggart,* 194 Cal.App.2d 84, 14 Cal.Rptr. 745 (1961).

It appears from the above discussion that the stipulated facts contain all of the elements necessary to prove a common law larceny, and consequently, under the *Rogers* decision, the offense is punishable under 18 U.S.C. § 2113(b). The Court finds beyond a reasonable doubt that the defendant is guilty as charged on the facts stipulated to, and directs the Clerk to enter a judgment of conviction.